**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PLAIN LOCAL SCHOOL DISTRICT** | ) | **CIVIL ACTION NO. 2:19-CV-05086** |
| **BOARD OF EDUCATION, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE MICHAEL WATSON** |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE CHELSEY M.** |
| | ) | **VASCURA** |
| **MIKE DEWINE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs Plain Local School District Board of Education ("Plain Local"), on behalf of all of its students, and C.L., J.L., B.H., and C.H. (collectively, "Plaintiffs") respectfully request summary judgment in their favor on every claim asserted in their First Amended Complaint ("FAC"), ECF #18, against Defendants Paolo DeMaria, in his official capacity as Superintendent of Public Instruction and Secretary of the State Board of Education of Ohio (the "State Board"), Laura Kohler, Charlotte McGuire, Linda Haycock, Kirsten Hill, Jenny Kilgore, Lisa Woods, Antoinette Miranda, Sarah Fowler, John Hagan, Stephanie Dodd, Nick Owens, Meryl Johnson, Eric Poklar, Cindy Collins, Mark Lamoncha, Martha Manchester, Mike Toal, Steve Dackin, and Reginald Wilkinson, in their respective official capacities as officers and members of the State Board (collectively, the "State Board Defendants" or the "State Board") and Defendant The Village of Hills and Dales ("Hills & Dales").

As more fully stated in the attached Memorandum in Support of this Motion for Summary Judgment, Ohio Rev. Code § 3311.242 ("R.C. 3311.242" or "the Fast-Track Transfer Statute), both on its face and as applied to the two petitions to transfer territory that is currently a part of

Plain Local to Jackson Local School District and North Canton School District pursuant to R.C. 3311.242 (jointly, the "Transfer Requests"), violates Plaintiffs' fundamental, constitutional rights to equal protection and due process under the law, as well as Title VI of the Civil Rights Act and the Equal Educational Opportunities Act ("EEOA"). Additionally, due to what the State Board has conceded were "procedural anomalies" in the legislative process by which it was enacted, the Fast-Track Transfer Statute violates Article II of the Ohio Constitution.

Accordingly, Plaintiffs respectfully request that this Court declare that the Fast-Track Transfer Statute and the Transfer Requests (submitted pursuant to that statute) are unconstitutional, and permanently enjoin the State Board Defendants, as well as their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them, from: enforcing, implementing, or acting pursuant to the Fast-Track Transfer Statute or approving the transfers contemplated in the Transfer Requests, and award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

Respectfully submitted,

/s/ *Amanda Martinsek*
Amanda Martinsek (0058567)
William D. Edwards (0062861)
Daniela Paez (0091212)
Gregory C. Djordjevic (0095943)
ULMER & BERNE LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
216-583-7000 / Fax: 216-583-7001
Email: amartinsek@ulmer.com
Email: wdedwards@ulmer.com
Email: dpaez@ulmer.com
Email: gdjordjevic@ulmer.com

Rex A. Littrell (0042419)
Rachael Rodman (0073872)
ULMER & BERNE LLP
65 East State Street, Suite 1100
Columbus, Ohio 43215-4213
614-229-0000 / Fax:  614-229-0001
Email: rlittrell@ulmer.com
Email: rrodman@ulmer.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PLAIN LOCAL SCHOOL DISTRICT | ) | CIVIL ACTION NO. 2:19-CV-05086 |
| BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE MICHAEL WATSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE CHELSEY M. |
| | ) | VASCURA |
| MIKE DEWINE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Amanda Martinsek (0058567)
William D. Edwards (0062861)
Daniela Paez (0091212)
Gregory C. Djordjevic (0095943)
ULMER & BERNE LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
216-583-7000 / Fax: 216-583-7001
Email: amartinsek@ulmer.com
Email: wdedwards@ulmer.com
Email: dpaez@ulmer.com
Email: gdjordjevic@ulmer.com

Rex A. Littrell (0042419)
Rachael Rodman (0073872)
ULMER & BERNE LLP
65 East State Street, Suite 1100
Columbus, Ohio 43215-4213
614-229-0000 / Fax:  614-229-0001
Email: rlittrell@ulmer.com
Email: rrodman@ulmer.com

*Attorneys for Plaintiffs*

## PRELIMINARY STATEMENT

Less than three weeks ago, the State Board counseled Ohio that, as "our nation grapples with the hard truths of racism and inequality," the State Board, like all of us, "must acknowledge that Ohio's education system has not been immune to these problems, and . . . we have a great deal of work left to do." Ex. 3 (January 2020 State Board Resolution), p. 1.  In fact, while "'separate but equal' is no longer the law of the land, [] systemic inequity in education has relegated millions of children of color to under-resourced, struggling schools." *Id*.  As a law that permits unfettered territorial transfers and precludes the State Board from considering a transfer's racial isolation implications or the interests of any (much less every) student, the Fast-Track Transfer Statute[1] is a modern day effort to exacerbate, specifically and discriminatorily, the disparities that have resulted in "significant gaps between the performance of Black students compared to their white peers [] even in generously resourced schools." Ex. 3.  It must be struck down.

In 2005, the State Board adopted the findings of a neutral hearing officer who, after a two-day hearing, found that transferring the territory of Hills & Dales, an overwhelmingly white, wealthy community, from Plain Local to Jackson Local School District ("Jackson Schools"), a district with a significantly lower percentage of minority and economically disadvantaged students, would have increased racial and socioeconomic isolation, impaired Plain Local's educational programming and operations, and lacked any rational basis.  That undeniably correct application of the law preventing racial isolation and socio-economic inequalities is the cradle in which the Fast-Track Transfer Statute was born.

In rejecting Hills & Dales's prior transfer request, the State Board properly applied Ohio Rev. Code § 3311.24 ("R.C. § 3311.24"), one of two statutes that, in tandem with Ohio

---

[1] Ex. 1 (Ohio Rev. Code § 3311.242, "Proposal to transfer territory; process"). Citations to "Ex. ___" are to exhibits to the attached Declaration of Amanda Martinsek ("Martinsek Decl.").

Administrative Code ("OAC") Chapter 3301-89, Ex. 2 (collectively, the "Pre-Existing Safeguards"), until October 2019, protected *all* Ohio students from transfers that would increase or perpetuate the well-documented systemwide segregation in Ohio schools. The Transfer Requests at issue here are made pursuant the Fast-Track Transfer Statute, a law enacted after Hills & Dales admittedly influenced the General Assembly to "request legislation that would facilitate" the transfer that the State Board had previously disapproved. Hills & Dales readily acknowledges that the racial, socioeconomic, and funding realities that the State Board recognized in 2005 remain unchanged. Yet, Hills & Dales brazenly argues that, notwithstanding these fundamental constitutional violations, its October 2019 transfer request (the "2019 Hills & Dales Request") must be approved because the legislature, *at its behest*, enacted a statute that gave it the unfettered power, not afforded to all in Ohio, to re-draw school district boundaries at its whim, regardless of the segregative or discriminatory impact or intent.

The State Board, which conceded the "procedural anomalies"[2] that ensured that the Fast-Track Transfer Statute was passed under cover of darkness and without discussion (much less debate), has offered no credible reason for its defense of a statute that unprecedentedly strips it of its role as "the arbiter of school boundaries" and makes it complicit in segregative transfers through its statutorily mandated rubber stamp.[3] Indeed, the State Board Defendants, while asserting that they "take no position" on the merits of the segregative transfers, have simultaneously, surreptitiously collaborated with Hills & Dales to thwart Plaintiffs' efforts to challenge the constitutionality of the Fast-Track Transfer Statute and the Transfer Requests.

Defendants' own admissions and testimony, Plain Local's uncontroverted evidence, and

---

[2] *See* 2/25/20 Hr'g Tr. 10:9-11 (BY MR. REED: "We think that what's important for the Court to look at is despite the procedural anomalies . . . .").
[3] (Brinkman Dep. Ex. 3 at BRINKMAN 000075); (DeMaria Dep. 138:7-19).

the applicable legal standards establish that there is no genuine issue of material fact, and that

Plaintiffs are entitled to summary judgment in their favor for at least the following reasons:

- Analyzing the evidence in the record under the standards in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 (1977), a reasonable factfinder must find discriminatory intent because the record reflects that: aware of and intending the racial isolation implications, Hills & Dales colluded with Ohio legislators and influenced the General Assembly to enact legislation that would facilitate the transfer of its territory to a whiter, wealthier school district while divesting Plaintiffs of the Pre-Existing Safeguards; the Transfer Requests will increase inter-district racial segregation; and there is no credible, nondiscriminatory reason for the Fast-Track Transfer Statute or the Transfer Requests. Indeed, the Fast-Track Transfer Statute, an unprecedented delegation to voters of an Ohio Department of Education ("ODE") function, was steamrolled through both houses in a "procedurally anomalous" manner that made it impossible for the public to provide any input;

- There is no justification for the arbitrary classifications that the Fast-Track Transfer Statute creates;

- Applicable law and the State Board's own policies and practices establish that Ohio created a constitutionally protected property interest in a nondiscriminatory, adequate education that cannot be taken away without due process of law; and,

- The Fast-Track Transfer Statute is unrelated to appropriations,[4] and it was not read three separate times on different days in either the House or the Senate in violation of the Ohio Constitution, and the State Board has fully litigated the merits of Plaintiffs' state law claims, thereby waiving any sovereign immunity defense.

The Fast-Track Transfer Statute violates Plain Local students' constitutional and civil rights, and deprives them of the safeguards that served as a hallmark against resegregation for decades. Plaintiffs are entitled to judgment in their favor as a matter of law and to an award of fees and costs under 42 U.S.C. § 1988.

## **FACTUAL BACKGROUND**

## I.  **Plain Local is a School District That "Truly Reflect[s] Our Pluralistic Society."**

The State Board recognized that "[m]oving Ohio into the 21st century demands the creation

---

[4] House Bill 166 ("HB 166"), the state biennial budget bill, was formally introduced on March 25, 2019. *See* Ex. 23 (HB 166 – As Introduced).

of an equitable education and schools that truly reflect our pluralistic society." (*See* DeMaria Dep.[5] at 127; *see also* DeMaria Dep. Ex. 5, Diversity Strategies for Successful Schools Recommendations Report ("Diversity Strategies Report")), p. 36.[6] Plaintiffs C.L., J.L., B.H., and C.H. currently attend Plain Local, which brings this lawsuit on behalf of all of its students. Plain Local serves parts of Plain Township, the City of Canton, the City of North Canton ("North Canton"), Lake Township, Nimishillen Township, and Jackson Township, including Hills & Dales. *See* Declaration of Brent W. May in Support of Plaintiffs' Motion for Summary Judgment ("May Decl.")) ¶ 4; May Decl. Ex. 4 (Plain Local School District Map (ODE 003226)). Other areas of Jackson Township are served by Jackson Schools, and other areas of North Canton are served by North Canton School District ("North Canton Schools"). May Decl. Ex. 4. Plain Local is a model of racial and socioeconomic diversity, serving students living in multimillion-dollar homes as well as students living in areas that have the highest poverty rates in Stark County, Ohio. (May Dep. at 106:9-108:10.) The percentages of white, minority, and economically disadvantaged students in Plain Local are on par with statewide demographics, making its student body one "that looks like America, looks like Ohio."[7] *Id*. As such, Plain Local provides its students the rare opportunity to attend a school that "reflect[s] our pluralistic society." (*See* DeMaria Dep. Ex. 5, Diversity Strategies Report, p. 36.).

---

[5] Per this Court's Standing Orders, deposition transcripts cited herein are being filed concurrently with this brief. Citations to "___ Dep." are citations to the deposition transcripts that have been filed with the Court.

[6] The State Board accepted the Diversity Strategies for Successful Schools Recommendations Report (the "Diversity Strategies Report"), *available at* http://education.ohio.gov/getattachment/State-Board/State-Board-Reports-and-Policies/Diversity-Strategies-Policy/Diversity-Strategies-Report-Final-Recommendations-9-12-11.pdf.aspx, on September 13, 2011, and passed a resolution to adopt it on May 15, 2012. Ex. 20 (State Board, *May 2012 State Board of Education Meeting Board Book, Vol. 4*), pp. 116-117, *available at* ftp://ftp.ode.state.oh.us/ODEMediaWeb/State_Board_Board_Books/May_2012/. The State Board's Board Books are available on ODE's website. *See* ODE, *About the State Board of Education*, *available at* http://education.ohio.gov/State-Board/State-Board-of-Education-Home. The Board Books are self-authenticating because "[o]fficial publications available electronically from a government website should be accepted by the court as self-authenticating." *Rote v. Zel Custom Mfg., LLC*, 383 F.Supp.3d 779, 785 (S.D. Ohio 2019).

[7] The "Statewide average" of white, black, and disadvantaged students for Fiscal Year ("FY") 2019 is 71.31%, 14.68%, and 47.93%, respectively. (Rausch Dep. Ex. 5, FY 2019 District Profile Report ("2019 Dist. Profile"))

Plain Local's racial and socioeconomic diversity stands in stark contrast to that of adjacent school districts Jackson Schools, North Canton Schools, and Lake Local School District ("Lake Schools"). May Decl. Ex. 3 (Plain Local Adjacent School Districts Map (ODE 003251)). In FY 2019, 42.37% of the students in Plain Local were categorized as "Disadvantaged." In comparison, only 16.26% of the students attending Jackson Schools and 18.97% of the students attending North Canton Schools were categorized as "Disadvantaged." Rausch Dep. Ex. 5, FY2019 Dist. Profile Report for Plain Local SD, Stark ("2019 Dist. Profile"). Further, while less than 72% of students in Plain Local are white, over 90% of the students in North Canton Schools and over 87% of the students in Jackson Schools are white. *Id*. Only 2% of the students in Jackson Schools are black, and only 2.63% of the students in North Canton Schools are black. *Id*. In comparison, 15.25% of students in Plain Local are black.[8] *Id*. Thus, Plain Local faces the "geographic challenges" that "foster[]" the "***inter***-district segregation" recognized in the Diversity Strategies Report. Rausch Dep. Ex. 5, p. 25 (emphasis added).

Plaintiffs C.L. and J.L. are siblings and white Plain Local students who recently finished the ninth grade and the seventh grade, respectively. (S.L. Dep. at 52, 62). Their family chose to move into Plain Local to educate C.L. and J.L. in a diverse school district. *Id*. 20:2-21:7; 31:15-32:18. The family chose—and values—Plain Local because it has "exposed [C.L. and J.L.] to a demographic that actually prepares them for the future careers that they're going to pursue." *Id*. at 20. Plaintiffs C.H. and B.H. are siblings and African American students attending Plain Local. C.H. recently finished the sixth grade and B.H. recently finished the ninth grade. (H.H. Dep. at 16:12-16). Their family chose to "buy a home in the Plain Local school system" because of the

---

[8] For Fiscal Year 2019, only 14.28% of the students attending Lake Schools were "Disadvantaged." Lake Schools' student population is 94.51% white, and only 0.24% of its students are black. Ex. 10 (FY 2019 District Profile Report, Lake LSD).

quality of the education and the diversity, which offers C.H. and B.H. the opportunity to "interact[] with different persons or people from different religions, ethnic backgrounds, people who have a rural or suburban . . . experience." (*Id*. at 92:22-93:5; 44:3-18).

Prior to moving into Plain Local, B.H. and C.H. attended North Canton Schools. (*Id*. at 46:2-11, 51:6-20). Their father H.H. testified that his family "never felt . . . welcome there," and reported that another student called C.H., who was then in kindergarten, a racial slur on the school bus. *Id*. at 47:2-15. The family "move[d]" out of "North Canton [Schools] because it . . . didn't provide" a "diverse education in any way." (*Id*. at 49:3-6). To H.H., who attended "an African-American school system," Plain Local's diversity is of paramount importance, as he "never want[ed] [his] kids to be in an all-white environment or all-black environment[] because that's not the world we live in." (*Id*. 57:14-58:8).

Over the past 15 years, Plain Local has faced repeated efforts by white, affluent communities to transfer to Jackson Schools and North Canton Schools. Declaration of Kathleen N. Jordan in Support of Plaintiffs' Motion for Summary Judgment ("Jordan Decl.") ¶¶ 5, 9. The Pre-Existing Safeguards have prevented Plain Local's students from losing the "holistic," "diverse" education that they benefit from and that C.H., B.H., J.L., and C.L. expressly wish to continue to benefit from in furtherance of their education. The Fast-Track Transfer Statute threatens these opportunities, as it would allow racially concentrated, affluent areas such as Hills & Dales and the Irondale territory to become a part of whiter, more affluent school districts, gradually eliminating Plain Local's diversity, and leaving it as an increasingly racially identifiable district with fewer resources to serve its students.

II.    **Hills & Dales's Self-Described "Affinity" or "Alignment" with Wealthier, Whiter Jackson Schools Motivates its Unrelenting Legal and Legislative Efforts to Transfer.**

    A.    **Hills & Dales's 2004-2005 Attempt to Transfer to Jackson Schools.**

Hills & Dales is an incorporated village in Stark County, Ohio, *see* Hills & Dales Ans. to FAC, ECF # 34, ¶ 26, and a "high income [] community of homes and 202 acres built in the 1920's." Jordan Decl. Ex. 4 (Hearing Officer's Report and Recommendation, *In re: Request to Transfer from Plain Local School District to Jackson Local School District* ("2005 R&R")), p. 4. Hills & Dales has been a part of Plain Local since 1954. *Id.* In the early 2000's, Plain Local experienced a significant demographic shift: the percentage of black students attending Plain Local *increased* from 2% in 2000 to approximately 11% in 2004, and the percentage of white students *decreased* from 95% to around 86%. Ex. 5 (Hills & Dales Sequence of Events Timeline ("Hills & Dales Timeline")), p. 1.[9] As Plain Local became more diverse, the number of Hills & Dales children attending Plain Local precipitously declined in what Hills & Dales resident David Grabowsky described as a "flight" or "exodus" from Plain Local. (*See* Grabowsky Dep. Ex. 1, 2005 Hr'g Tr., Vol. I at 194, 201). As Hills & Dales students continued to "clear[] out" from Plain Local, *id.* at 201, Hills & Dales began to "investigate . . . changing" its "school district . . . to Jackson [Schools]." (Conley Dep. Ex. 4, (1/13/04 Council Minutes) at VILLAGE 0003). A brochure promoting the transfer initiative offered a "historical perspective," advertising that "[h]istorically, [Hills & Dales] has selected a school district to serve the needs of the children residing [t]here," and its "communal experience st[ood] to be enriched by our children attending our recognized community schools – JACKSON." (Grabowsky Dep. Ex. 2).

In March 2004, Hills & Dales submitted a request to transfer to Jackson Schools pursuant to the Pre-Existing Safeguards, which governed *all* school-district transfer requests in Ohio from

---

[9] The Hills & Dales Timeline, Ex. 5, is a summary of the voluminous exhibits referenced in Exhibit 10, all of which are also attached as exhibits to the Martinsek Decl. or the Jordan Decl. *Alliant Tax Credit Fund 31-A, Ltd. v. Murphy*, 494 F. App'x 561, 572 (6th Cir. 2012) (citing Fed. R. Evid. 1006).

1987 until the enactment of the Fast-Track Transfer Statute.[10]  (Jordan Decl. ¶ 4; Conley Dep. Ex. 4, 3/09/04 Council Minutes at VILLAGE 0010; Jordan Decl. Ex. 1 06/04/04 Letter to ODE).  In March 2004, Hills & Dales Council allocated funds to hire "'Special Counsel' for . . . the school system change." (Conley Dep. Ex. 4 at VILLAGE 0010).  It later authorized additional expenditures for legal fees and financial and traffic experts to support the transfer request. (*Id.* (9/14/04 Council Minutes) at VILLAGE 0025).

The 2004 request to transfer Hills & Dales from Plain Local Schools to Jackson Schools was the subject of a two-day hearing held on March 16-17, 2005 before a neutral hearing officer. (Jordan Dep., 132:18-24; Jordan Decl. ¶ 6; Jordan Decl. Ex. 4 (2005 R&R)).  Under the Pre-Existing Safeguards, the hearing officer was charged with giving primary consideration "to the present and ultimate good" of the students affected, considering (among other factors) that "[t]he transfer ***shall not cause, preserve or increase racial isolation***," and "[t]he pupil ***loss of the relinquishing district <u>should not</u>*** be such that [its] educational program . . . [was] severely impaired."  OAC § 3301-89-03(B)(5) and (8) (emphasis added).

At the March 2005 hearing, multiple Hills & Dales's witnesses testified that the transfer was motivated by "an affinity to the community of Jackson."  Grabowsky Dep. Ex. 1 (2005 Hr'g Tr., Vol. I) 71:10-19.  Among Hills & Dales's witnesses was David Grabowsky, who also circulated the petitions that initiated the 2019 Hills & Dales Request. (May Decl. Ex. 1 at PLSD 045251; Grabowsky Dep. at 22).  Mr. Grabowsky testified that the transfer request was motivated by a "flight" of Hills & Dales residents from Plain Local, and explained that a "big issue" that informed his decision to not send his children to Plain Local was that "nobody in" Hills & Dales

---

[10] *See* OAC § 3301-89-01(A) ("The rules under Chapter 3301-89 of the Administrative Code apply to the request for a transfer . . . under [R.C.] 3311.06 . . . or petition to for transfer of territory under [R.C.] 3311.24 . . ."). R.C. 3311.06 governs the proposed annexation of school district territory incidental to its annexation by a city or village.

attended Plain Local because "[e]verybody [] cleared out . . . ." (*Id.* at 201:1-5).

At the time of the 2005 hearing, Plain Local's student body was 11.2% black, and 2.3% of the students in Jackson Schools were black. Jordan Decl. Ex. 4 (2005 R&R), pp. 9-10. Hills & Dales's population as of the 2000 U.S. Census was 0.4% black and over 95% white. *Id.* Had the transfer been approved, Plain Local's general fund loss would have been approximately $500,000 annually. *Id.* at 9. After the hearing, where the parties presented over 100 exhibits and testimony from 18 fact and expert witnesses, the hearing officer recommended that the State Board deny the request, concluding that "[d]enial of the petition [was] in the best interest of" all students affected. *Id.* at pp. 24-25. The hearing officer found that transferring Hills & Dales, "the highest income white territory of Plain Local[,] to the wealthier and less racially and socio-economically diverse Jackson [Schools] implicate[d] the racial impact concerns about territory transfers," and that the "loss of valuation" would have a "detrimental effect . . . on Plain Local such as classroom and teacher cuts." *Id.* at pp. 16-17, 18. The hearing officer also determined that Hills & Dales's proffered reasons for seeking the transfer, the purported safety of transportation routes and "affinity to the community of Jackson," were not credible. *Id.* at 24.

On July 18, 2005, after the hearing officer issued her recommendation that the State Board deny Hills & Dales's request to transfer to Jackson, Council reported that "[t]he hearing officer ***recommended against the transfer . . . from Plain to Jackson on socio-economic and racial grounds***." Conley Dep. Ex. 4, (7/18/05 Council Minutes) at VILLAGE 0039 (emphasis added). Hills & Dales then passed a resolution to appropriate additional funds. *Id.* In September 2005, the State Board adopted the hearing officer's recommendation and denied the proposed transfer of Hills & Dales to Jackson. Jordan Decl. Ex. 5 (9/19/05 ODE Letter and Resolution). Hills & Dales Council reported that the transfer efforts "already cost the Village" approximately $40,000 and

authorized additional funds for the appeal. Conley Dep. Ex. 4, (9/19/05 Council Minutes) at VILLAGE 0042. Hills & Dales appealed the State Board's decision to the Franklin Court of Common Pleas, which dismissed its appeal, as affirmed by the Tenth District Court of Appeals. *Hills & Dales v. Ohio Dept. of Educ.*, 2007-Ohio-5156. The Ohio Supreme Court declined jurisdiction. *Hills & Dales v. Ohio Dep't of Educ.,* 2008-Ohio-969, 882 N.E.2d 445.

### B. Hills & Dales's Officials Lobby for a Legislative "Fix."

After failing to achieve the transfer through the Pre-Existing Safeguards, Hills & Dales searched for alternative avenues to accomplish transfer, which included discussions with elected officials. Indeed, Stark County Auditor Alan Harold testified that he has "known since the day [he] took office" in 2011 that Hills & Dales (including "residents and realtors") had "want[ed] to move . . . to Jackson [Schools]." (Harold Dep. 31:25-32:2, 63:5-16). Councilman Peppard testified that the issue was "brought up" at Hills & Dales Council meetings "[p]robably once a quarter . . ." during his 2015-2019 tenure in Council. (Peppard Dep. 98:15-21; 199).

Councilman Peppard knew that "no school district transfer was going to happen under" the Pre-Existing Safeguards. *Id*. at 192-93. The Pre-Existing Safeguards precluded the State Board from considering a proposed transfer that was previously disapproved unless it "determines that significant change has taken place subsequent to the filing of the original request." OAC § 3301-89-01(E). It is undisputed that no "significant change" has taken place since 2005. *See id*. 170-72. As of the 2010 census, *92.8%* of the population of Hills & Dales was white, and it had *0 black residents*. Ex. 6 (Hills & Dales U.S. Census Data) at PLSD 025321. Nearly 30% of the students in Plain Local are minorities, a figure that is significantly higher than Jackson Schools', where over 87% of the students are white. Ex. 4, (2019 Dist. Profile).

The April 2018 Hills & Dales Council minutes confirm that Hills & Dales was "once again looking into the issue of the public school district to be used by the village." Conley Dep. Ex. 4,

(4/11/18 Council Minutes) at VILLAGE 0255. Between 2016 and 2019, Councilman Peppard had multiple discussions with State Sen. Kirk Schuring during which he informed Sen. Schuring of the previous attempt to transfer to and requested "legislation that would facilitate a transfer" of Hills & Dales to Jackson Schools. (Schuring Written Dep. Ans. Nos. 3, 4, 10, pp. 2, 4; *see also* Ex. 5 (Hills & Dales Timeline)). Councilman Dunn was also "advis[ing] Council" regarding avenues to accomplish the transfer. *Id*.; Conley Dep. Ex. 4 (4/11/18 Council Minutes) at VILLAGE 0256; Ex. 5 (Hills & Dales Timeline). The results of a December 2018 Hills & Dales Council survey showed that 95% of Hills & Dales's residents supported transferring Hills & Dales to Jackson Schools. (Dunn Dep. at 141, 170, 175-76). These efforts continued through 2019 and, in the "few months" prior to July 2019, Councilmen Peppard and Dunn "worked pretty tirelessly . . . on legislation [to] enable" Hills & Dales "to transfer to Jackson." (Peppard Dep. Ex. 23, 7/26/19 Email at VILLAGE 01307). The Fast-Track Transfer Statute is the result of these "tireless" efforts.

HB 166 was read for the first and second times in the House on March 25 and 26, 2019, **prior** to the surreptitious insertion of the Fast-Track Transfer Statute. (*See* Ex. 8 (Budget Development Process Timeline); *see also* Ex. 9 (3/25/19 House Journal), pp. 190-92; Ex. 10 (3/26/19 House Journal), p. 199). In May 2019, State Rep. Scott Oelslager, House Finance Committee Chair, introduced an amended HB 166 that included the text of R.C. 3311.242 in the 3000+ page budget bill. Ex. 11 (Sub. H.B. 166); Ex. 12 (5/2/19 House Finance Minutes). The Fast-Track Transfer Statute gives communities located in "Eligible Townships," those served by more than one school district—and no one else—unfettered discretion to choose their school district without any consideration of the impact on the students left behind. R.C. 3311.242(A). Under it, communities like Hills & Dales can force a school district transfer if: (1) ten percent of the electors in the community "request such a transfer," and (2) the request is then approved by a

simple majority of the electors in that community. R.C. § 3311.242(C) and (E). The Fast-Track Transfer Statute, which vitally altered the budget bill by "chang[ing] [] the state law" on school district territory transfers, (Kohler Dep. at 88-91), was read in the House for the first and only time on May 9, 2019, when the House passed HB 166. Ex. 13 (5/9/19 House Journal), pp. 413-14.

HB 166, without the Fast-Track Transfer Statute, was introduced in the Senate and read for the first and second times on May 13 and 14, 2019. Ex. 14 (5/13/19 Senate Journal), pp. 396-400; Ex. 15 (5/14/19 Senate Journal), pp. 401-04. The text of R.C. 3311.242 was stricken from HB 166 while in the Senate Finance Committee, Ex. 17 (Am. Sub. H.B. No. 166), and, on June 20, a version of HB 166 that *did not* include the Fast-Track Transfer Statute was read and passed by the Senate. Ex. 16 (6/20/19 Senate Journal), pp. 581-91; Ex. 8 (Budget Development Process Timeline).

After June 20, Stark County Auditor Harold met with Councilman Peppard to discuss the Fast-Track Transfer Statute and gave him a copy of the "LSC Comparative Document HB 166 as Reported by House Finance" with a handwritten note that the provision was "pulled from the Senate version." (Peppard Dep. Ex. 13 at VILLAGE 01150-VILLAGE 01152; *see also* Ex. 5 (Hills & Dales Timeline)). On **June 24**, Councilman Peppard called Sen. Schuring "and said that the Senate took" R.C. 3311.242 "out of [HB 166] and asked if [Sen. Schuring] could help get it back in the bill." (Schuring Written Dep. at Ans. No. 13, p. 5). Councilman Peppard also called Rep. Oelslager "on behalf of the Village of Hills and Dales" to express "the village's support for" the provision, (Oelslager Written Dep.), Ans. No. 8, p. 3, and communicated with Mayor Samolczyk, W.R. Timken, and Roger DeVille. Ex. 5 (Hills & Dales Timeline); Peppard Dep. at 224-25; Peppard Dep. Ex. 12, (6/24/19 Email); Peppard Dep. Ex. 13, (6/24/19 Email)).

On **June 25,** the Conference Committee on HB 166 held a hearing before the House on a version of the bill that ***did not include the text of R.C. § 3311.242***. Ex. 17 (Am. Sub. H.B. No.

166). On July 6, 2019, Councilman Peppard, Councilman Dunn, Chief of Police Zeno, Mayor Samolczyk, W.R. "Tim" Timken, Roger DeVille, Paul Bishop, and William Belden, on behalf of Hills & Dales and on its official letterhead, sent a letter to the HB 166 Conference Committee, urging it to pass the Fast-Track Transfer Statute as it was of "utmost importance" to Hills & Dales. (Peppard Dep. at 241-42; Peppard Dep. Ex. 15, (7/6/19 Letter) at VILLAGE 001650-VILLAGE 001651 (the "July 6 Letter")).

On July 16, 2019, Rep. Oelslager successfully moved to re-insert EDUCD66,[11] the amendment that became R.C. 3311.242, into HB 166. Ex. 18 (7/16/19 Tr.) 33:23-34:8.[12] Later that day, Sen. Schuring personally called Councilman Peppard to notify him that "3311.242 was included in [the version of HB 166 that] was approved." (Peppard Dep. at 122-23, 124). Councilman Peppard shared the "very encouraging news from Senator Kirk Schuring" that "[Hills & Dales's] desired language [was added] back into HB 166" with Mayor Samolczyk, Police Chief Zeno, Councilman Dunn and other residents.[13] (Peppard Dep. Ex. 18, 7/16/19 Email). In a July 21 email, Councilman Peppard stated that Sen. Schuring "was a massive help in this" and he "couldn't have done this without him." (Peppard Dep. Ex. 15, (7/21/19 Email)). Significantly, while Sen. Schuring personally called Hills & Dales with the news on July 16, 2019, *the State Board did not learn about "the change in the law" until September 2019, through a news article regarding Plain Local's lawsuit*. (Kohler Dep. at 86-87).

### III. The Fast-Track Transfer Statute Intentionally and Specifically Singles Out Plain

---

[11] *See* Oelslager Dep. Ex. 1-B at OELSLAGER00085-OELSLAGER00090 (7/14/19 Email with CC5911).

[12] The video of the July 16, 2019 Conference Committee proceedings can be found in the website of The Ohio Channel, http://www.ohiochannel.org/video/conference-committee-7-16-2019-am-sub-h-b-no-166?start=2166. For the Court's convenience, a transcript of that video is attached as Exhibit 33 to the Martinsek Decl.

[13] The HB 166 Conference Committee passed the Fast-Track Transfer Statute 4-2. Rep. Cera, who voted against it, explained that the law was never "discussed in subcommittee at all" and the General Assembly "didn't know which districts [it] would apply to or who was seeking it." (Cera Aff. Ex. 1, 9/20/19 Email at CERA000002).

**Local Students and Deprives Them of the Pre-Existing Safeguards.**

Until the advent of the Fast-Track Transfer Statute, the State Board was "the arbiter of school district boundaries" in Ohio.  (Brinkman Dep. Ex. 3 at BRINKMAN 000075).  The Pre-Existing Safeguards remain in place, *see, e.g.,* (DeMaria Dep. at 113:2-12), and, as such, continue to protect the rights of students in school districts ***not*** serving Eligible Townships.  The Fast-Track Transfer Statute is an alternative mechanism, available only to a defined subset of the population, which arbitrarily gives Hills & Dales an avenue to sidestep the Pre-Existing Safeguards and divests students in Eligible Townships of their rights and interests they protect.  Under the Fast-Track Transfer Statute, however, the State Board has no "discretion to reject the proposal,"[14] and is not authorized to consider the best interests of the students affected, the racial isolation implications, or its fiscal impact on the relinquishing district. (Kohler Dep. 96-98). Instead, the Fast-Track Transfer Statute **requires** the State Board to approve any transfer request under R.C. 3311.242, regardless of how segregative or discriminatory it may be.

R.C. 3311.242's delegation of a State Board function exclusively to the subset of voters seeking a specific outcome (writing out everyone else from the process) is unprecedented:

> **Q. I believe you testified that prior to the enactment of 3311.242, the State Board of Education was the arbiter of school boundaries; is that true?**
> A. Yes.
> **Q. To your knowledge, has the legislature ever taken a role that's historically been in the hands of the State Board of Education and put it in the hands of voters?**
> A. Not that I can think of, no.

(DeMaria Dep. at 138:7-19).

## IV.   **"Highly Concerned" That it Would be Repealed, Hills & Dales Rushes to Avail Itself**

---

[14] *See* Ohio Legislative Service Commission, Final Analysis – H.B. 166 of the 133rd General Assembly (September 20, 2019), https://www.lsc.ohio.gov/documents/budget/133/MainOperating/FI/BillAnalysis/19-HB166-133.pdf.

**of the Fast-Track Transfer Statute.**

The budget-related provisions of HB 166 went into effect immediately, but the Fast-Track Transfer Statute did not become effective until October 17, 2019.[15]  Hills & Dales, however, began to work on a petition immediately after Sen. Schuring personally informed Councilman Peppard of its inclusion in the Conference Committee's report.  Indeed, in response to a July 20 email to Council President Fay, Councilman Peppard, Police Chief Zeno, Mayor Samolczyk, and Mike Biasella where Councilman Dunn emphasized that "**[t]ime is of the essence**," Councilman Peppard wrote:

> Timing truly is very important here.  This is the time.  I am highly concerned this will be removed from ORC next year.  If we miss this opportunity, it will be years, possibly decades before the opportunity arises again.

(Dunn Dep. Ex. 20, (7/21/19 Email) at VILLAGE 0612).

On September 23, 2019, Plain Local filed suit challenging the constitutionality of the Fast-Track Transfer Statute and seeking temporary, preliminary and permanent injunctive relief against its implementation and enforcement.  *See Plain Local School Dist. Bd. of Educ. v. DeMaria*, S.D. Ohio Case No. 19-cv-4246.  Hills & Dales was not a defendant in that case, *id*. at ECF #1, but a series of internal Hills & Dales communications and its communications with counsel for Superintendent DeMaria (then the only defendant) show that Hills & Dales promptly joined the defense of what Councilman Dunn referred to as "our," meaning Hills & Dales's, "legislation" in "the budget bill."  (Peppard Dep. Ex. 27 at PEPPARD 000093); Ex. 5 (Hills & Dales Timeline).

For example: Solicitor Conley asked counsel for the Superintendent to weigh in on his

---

[15] Under Ohio Constitution Article II, Sections 1(C) and 1(D), laws passed by the General Assembly generally take effect after 90 days, but "[l]aws providing for . . . appropriations for the current expenses of the state government and state institutions . . . shall go into immediate effect." That the Fast-Track Transfer Statute became effective 90 days after it was signed into law further demonstrates that it is not related to appropriations, the "subject" of HB 166.

decision to produce the July 6 Letter in response to Plain Local's counsel's public records request; (Conley Dep. Ex. 6, (9/30-10/1/19 Emails) at CONLEY 000028); Solicitor Conley advised Hills & Dales Council, after a call with the Superintendent's counsel, that "Mr. Reed and his firm are white hats," (*id*. at CONLEY 000032); following a call with the Attorney General's Education Section Chief Mia Yaniko, Councilman Peppard thanked her and sent a "document composed to give support to the defense." (Dunn Dep. Ex. 9, (9/30/19 Email) at PEPPARD 000095; Peppard Dep. Ex 26, (9/30/19 Email) at PEPPARD 000122); and, although well aware that Hills & Dales was ready to submit its petition, the Superintendent's counsel asked Hills & Dales to delay doing so, while arguing to the Court that Plain Local faced no imminent harm. (*See* CONLEY 000028, Peppard Dep. Ex. 3 at PEPPARD 000191, PEPPARD 000077).

On October 29, 2019, Solicitor Conley delivered to Plain Local a letter enclosing Hills & Dales's petition to transfer to Jackson Schools. May Decl. Ex. 1. On November 6, eight property owners on Irondale Circle in North Canton, Ohio sought a transfer of their properties to North Canton Schools. May Decl. Ex. 2. On November 20, Plain Local, on behalf of its students, filed this lawsuit challenging the constitutionality of the Fast-Track Transfer Statute. On January 9, 2020, the Ohio Supreme Court issued a writ of mandamus compelling Plain Local "to cause the . . . Board of Elections to check the sufficiency of the signatures" on the 2019 Hills & Dales Request. *State ex rel. Dunn v. Plain Local Sch. Dist. Bd. of Educ.*, 2020-Ohio-40 at ¶ 19.[16] On February 3, 2020, the Ohio Supreme Court issued another writ of mandamus, once again ***not*** considering or deciding the issues before this Court, but ordering the Stark County Board of Elections to "perform any . . . duties required . . . for the potential placement of the petition on the March 17 . . . ballot notwithstanding the 90-day requirement set forth in R.C. 3311.242(B)(2)." *State ex rel. Dunn v.*

---

[16] The Ohio Supreme Court did not consider or decide any of the claims pending before this Court, and Plaintiffs expressly reserved its federal claims for litigation before this Court.

*Plain Local Sch. Dist. Bd. of Educ.*, 2020-Ohio-339, ¶ 26. On February 5, 2020, the House passed a bill to "sunset" the statute on September 1, 2020, which would allow a transfer that "has begun" to "continue in accordance with the" Fast-Track Transfer Statute. (Brinkman Dep. Ex. 3).

At the June 2020 primary election, 150 out of 155 Hills & Dales electors voted in favor of the transfer. Jordan Decl. Ex. 14. Likewise, the majority of voters in the Irondale territory voted in favor of transferring to North Canton Schools. *Id.*

## LAW AND ARGUMENT

Under Fed. R. Civ. P. 56, the Court may enter "summary judgment to secure a just and efficient determination of an action. A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law." *Murray v. Ohio Dep't of Corr.,* No. 1:14-CV-168, 2019 WL 485214, at \*3 (S.D. Ohio Feb. 7, 2019) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The record here establishes that the Fast-Track Transfer Statute was enacted to effectuate a transfer that, as Hills & Dales knew, raised "socio-economic and racial" isolation concerns and could not be accomplished without depriving Plaintiffs of the Pre-Existing Safeguards. As such, the Fast-Track Transfer Statute violates Plaintiffs' equal protection and due process rights, Title VI, and the EEOA, and the "procedural anomalies" leading to its enactment violate Article II of the Ohio Constitution. Further, the State Board has waived any sovereign immunity defense to Plain Local's state law claims.

I.    **The Fast-Track Transfer Statute and the Transfer Requests Violate Plaintiffs' Equal Protection Rights.**

   A.    **The Fast-Track Transfer Statute Was Enacted to Accomplish a Transfer That Will Increase Racial Isolation.**

The Fast-Track Transfer Statute and the Transfer Requests have a racially segregative purpose and effect in violation of the Equal Protection Clause. Facially race-neutral laws can

nonetheless "be motivated by invidious racial discrimination." *Michigan State A. Philip Randolph Inst. v. Johnson*, 2018 WL 493184, at *10 (E.D. Mich. Jan. 19, 2018) (*Arlington Heights*, 429 U.S. at 267-68 (absent a "stark" pattern of discrimination, "the Court must look to other evidence.")). Facially neutral laws that are discriminatorily motivated "are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016), *cert. denied sub nom. North Carolina v. N.C. State Conference of NAACP*, 137 S. Ct. 1399 (2017). Plaintiffs can rely on the same evidence to prove discriminatory enactment and discriminatory implementation. *See Pac. Shores Props., LLC v. City of Newport Beach,* 730 F.3d 1142, 1164 n.29 (9th Cir. 2013) ("The evidence that the Ordinance was enacted with discriminatory intent also . . . support[s] . . . claim that . . . enforcement strategy was similarly calculated to accomplish a discriminatory goal . . . .").

While racial animus is evidence of impermissible racial motivation, other examples of equally impermissible racial discrimination include willful blindness, negative attitudes, and ignorance. *See McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1117 (9th Cir. 2004) (ignoring "racial overtones" of comments indicated "a willful blindness to racial stereotyping"); *Windsor v. U.S.*, 699 F.3d 169, 197 (2d Cir. 2012), *aff'd,* 133 S. Ct. 2675 (2013) (listing "animus, negative attitudes, malice, fear, the desire to harm a group, moral disapproval, [and] ignorance" as examples of "impermissible" forms of discrimination). Here, for example, the record includes multiple examples of Hills & Dales residents and officers displaying animus towards Plain Local[17] and expressed that the transfer is motivated by their "affinity," (Grabowsky Dep. at 22), or "alignment" with whiter, richer Jackson Schools, (Peppard Dep. at 242:25-243:15).[18]

---

[17] *See, e.g.,* (Grabowsky Dep. at 112-116; Harold Dep. Ex. 2 (Peppard Text Messages) at 19-20.
[18] *Garza v. County of Los Angeles*, 918 F.2d 763, 768 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991) (highlighting regional planner's testimony that he "developed the general feeling that [individuals] in the Boundary Committee had requested [an] additional area . . . because the residents of the area were regarded as 'our kind of people.'").

When the enactment or enforcement of a facially neutral statute produces disproportionate effects along racial lines, the Court must apply the *Arlington Heights* factors to determine whether Defendants' actions in enacting or implementing the statute violate the Equal Protection clause. *See Hunter v. Underwood*, 471 U.S. 222 (1985), 471 U.S. at 227 ("Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment.").  In *Arlington Heights*, the Supreme Court articulated the following "non-exhaustive factors" that must be considered to determine whether discrimination was a "motivating factor" for Defendants' actions: "evidence of [the law's] disparate impact," *id*. at *11 (citing *Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016); *Arlington Heights*, 429 U.S. at 266), as well as "the historical background of the decision, the sequence of events leading up to the decision, departures from normal procedure, departures in the substantive factors considered, and the legislative or administrative history." *Spurlock v. Fox*, 2012 WL 1514886, at *3 (M.D. Tenn. Apr. 30, 2012) (citing *Arlington Heights*, 429 U.S. at 267-68); *Moore v. Detroit School Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002).  "In instructing courts to consider the broader context surrounding the passage of legislation, the Court has recognized that outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *McCrory*, 831 F.3d at 221.

The *Arlington Heights* framework requires the Court to engage in a "totality of the circumstances analysis," as opposed to "consider[ing] [] each piece of evidence in a vacuum." *McCrory*, 831 F.3d at 233 ("Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context.").  Because Plaintiffs can demonstrate under the *Arlington Heights* factors that Defendants' actions created "a clear

pattern, unexplainable on grounds other than race," the Court must analyze the actions under strict scrutiny. *Arlington Heights*, 429 U.S. at 266. Under strict scrutiny, the burden shifts to Defendants to "prove that the measures are narrowly tailored to further a compelling government interest." *Harrington v. Scribner*, 785 F.3d 1299, 1306 (9th Cir. 2015).

Plaintiffs are not required to prove that the "sole," or even the "'dominant' or 'primary' purpose" of the Fast-Track Transfer Statute was racial. *Michigan State A. Philip Randolph Inst.*, 2018 WL 493184 at *10 (citing *Arlington Heights*, 429 U.S. at 266); *Gonzalez v. Douglas*, 269 F.Supp.3d 948, 964 (D. Ariz. 2017). Instead, they "need to show only that discriminatory purpose was 'a motivating factor.'" *Michigan State A. Philip Randolph Inst.*, 2018 WL 493184 at *10 (citing *Arlington Heights*, 429 U.S. at 266). In such a situation, "the judicial deference accorded to [Defendants] when balancing numerous competing considerations is no longer justified" because "racial discrimination is not just another competing consideration." *McCrory*, 831 F.3d at 221 (quotation marks omitted). Instead, the Court "must scrutinize [Defendants'] actual non-racial motivations to determine whether they alone can justify [Defendants'] choices." *Id*.

Proving a constitutional violation does not require "evidence of bad faith, ill will or any evil motive on the part of public officials." *Williams v. City of Dothan, Alabama,* 745 F.2d 1406, 1414 (11th Cir. 1984). Even when done without malice, a decision to impose disparate burdens on one race is unconstitutional. *See Garza*, 918 F.2d at 771. A totality of the circumstances analysis of the undisputed evidence here establishes that the racial isolation inherent in the Transfer Requests and the Fast-Track Transfer Statute was, at the very least, a motivating factor.

**B.** **The Fast-Track Transfer Statute and the Transfer Requests Evince a Discriminatory Motive Under *Arlington Heights*.**

The Fast-Track Transfer Statute compels the State Board to take state action to approve and collaborate in territorial transfers that would "increase or preserve" inter-district racial

20

isolation and impair the relinquishing school district's programming and operations. In doing so, it relegates minority students to attend schools that are "not only separate, but also unequal." *See Reed v. Rhodes*, 422 F.Supp. 708, 755 (N.D. Ohio 1976), *aff'd in part*, 607 F.2d 714 (6th Cir. 1979). Applying *Arlington Heights* to the evidence in this case, the Court should find that R.C. 3311.242 and the Transfer Requests are, at least in part, motivated by "intent to create or maintain racial segregation," and permanently enjoin their enforcement and implementation. *U.S. v. Yonkers Bd. of Educ.*, 624 F.Supp. 1276, 1292 (S.D.N.Y. 1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987).

  1. *The Fast-Track Transfer Statute's segregative impact was foreseeable to Hills & Dales.*

  Because people "usually intend the natural consequences of their actions," *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 487 (1997), evidence of the segregative impact of the Fast-Track Transfer Statute and the Transfer Requests is an important factor to determine segregative intent. *Yonkers Bd. of Educ.*, 624 F.Supp. at 1378; *Penick v. Columbus Bd. of Educ.*, 429 F.Supp. 229, 255 (S.D. Ohio 1977) ("full knowledge of the predictable effects of" a decision "upon racial imbalance . . . may be considered . . . in determining . . . segregative intent. . . .").[19] As Hills & Dales was aware, the State Board already found that transferring Hills & Dales to Jackson Schools would increase "socio-economic and racial" isolation, Conley Dep. Ex. 4 (7/18/05 Council Minutes) at VILLAGE 0039, by increasing the percentage of minority and disadvantaged students in Plain Local, Jordan Decl. Ex. 4 (2005 R&R), pp. 15-17. In 2011, the State Board found that a transfer to North Canton Schools requested by all-white petitioners (like the Irondale request) "would result in more Caucasian families leaving Plain Local . . . , thereby increasing [its] minority population" and raising "significant racial isolation implications. . . ." Jordan Decl. Ex. 8 (2011

---

[19] *See also Reed*, 422 F.Supp. at 713 ("It is thus clear that the necessary intent upon which a finding of de jure segregation is predicated, may be evidenced by the natural and foreseeable effects of the official practices and policies pursued").

R&R) at ODE001026. As the State Board also already found, those proposed transfers would also impair Plain Local's ability to serve the more segregated student body left behind. Jordan Decl. Ex. 4 (2005 R&R), p. 23; Jordan Decl. Ex. 8 (2011 R&R), p. 13-17.

The segregative impact of transferring Hills & Dales, "the highest income white territory of Plain Local to the wealthier and less racially and socio-economically diverse Jackson" Jordan Decl. Ex. 4 (2005 R&R), p. 16, is even more significant today. In 2005, only 14% of the students in Plain Local were racial minorities and 11.2% were black. *Id*. at p. 9. In 2011, the percentage of minority students in Plain Local was 19.1%, and 12.1% of students were black. As set forth *supra* at pp. 4-5, for 2019, the percentage of minorities in Plain Local has doubled, 15.25% of its students are black and 42.3% of the students it serves are disadvantaged. Rausch Dep. Ex. 5 (2019 Dist. Profile). Only approximately 2% of students in Jackson Schools and North Canton Schools are black, and less than 20% are disadvantaged. *Id.*; *supra* at pp. 4-5. In 2010, **Hills & Dales** was 92.8% white and **it had 0 black residents**.[20] All of the Irondale residents seeking to transfer to North Canton Schools are white. May Decl. ¶ 7. Accordingly, unless enjoined, the Transfer Requests will have a segregative impact.

In addition, unless enjoined, Plain Local, the district that would be left with a higher percentage of minority students, would also be left less able to provide services to its students and ***permanently*** lose the amount of taxes that Plain Local collects from the Irondale territory and Hills & Dales every year, which was over $720,000 in 2019. Jordan Decl. ¶¶ 15-17. In 2005 and 2011, the State Board found that the loss of less funding would have impaired Plain Local's "ability to provide high-quality services to [its left-behind] students." *Id*. at ODE001027; Jordan Decl. Ex. 4

---

[20] Ex. 6 (U.S. Census Bureau, Census 2010, American FactFinder, Table DP-1, Profile of General Population and Housing Characteristics: 2010, Geographic Area: Hills and Dales Village, Ohio, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk).

(2005 R&R), p. 18. As the ODE School Funding Director testified, no such formula exists today: "***State funding*** for fiscal year '20 and fiscal year '21 ***is equal*** to state funding in fiscal year '19 ***regardless of any sort of changes in student enrollment counts or property valuation***." Rausch Dep. at 77:16-78:15 (emphasis added)).

The Transfer Requests will have a segregative impact and impair the programming and opportunities available in the district left with a higher percentage of minority students, while increasing the percentage of wealthy, white students in (and resources available to) already segregated Jackson Schools and North Canton Schools. The negative impact will weigh more heavily on Plain Local, resulting in "schools that" are "not only separate, but also unequal." *See Reed*, 422 F.Supp. at 755. This result was known to Hills & Dales since at least 2005. (Conley Dep. Ex. 4, (7/18/05 Council Minutes) at VILLAGE 0039). When viewed in context, this supports the conclusion that Hills & Dales acted with segregative intent.[21]

> 2.    *Ohio and Hills & Dales have a long history of racial discrimination in education and housing.*

The "historical background," *see Arlington Heights*, 429 U.S. at 267, of the Fast-Track Transfer Statute and the Transfer Requests are also probative of segregative intent. *See Spurlock v. Fox*, 2012 WL 1514886, at *3 (M.D. Tenn. Apr. 30, 2012). First, the widespread racial segregation in education and housing in Ohio that persisted throughout the second half of the twentieth century led to multiple desegregation cases in the state. *See, e.g., Penick*, 429 F.Supp. at 232; *U.S. v. City of Parma*, 494 F.Supp. 1049 (N.D. Ohio 1980). The evidence presented during the Ohio school desegregation cases in Columbus, Cleveland, and Youngstown revealed that school districts engaged in a variety of "facially neutral act[s]" that nonetheless had an "effect"

---

[21] *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) ("Indeed, all actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979))).

that "was clearly segregative." (*See, e.g., Reed*, 422 F.Supp. at 782; Bowers Dep. 78 Ex. 1, Bowers Report), p. 3). Such facially neutral acts included altering boundary lines or otherwise manipulating where a given group of students would attend school for the purpose of keeping the races apart, thus perpetuating segregation. (Bowers Report, p. 3).

Dr. Bowers served as Assistant Superintendent of Public Instruction for ODE. *Id*. He was ODE's representative at trial of the desegregation cases, and largely authored the section of the Pre-Existing Safeguards that requires consideration of the racial isolation implications of a requested transfer. *Id*. The inclusion of that language in the Pre-Existing Safeguards was intended to protect Ohio students from territorial transfers that, like the facially neutral practices that Dr. Bowers observed in the desegregation cases, "cause[d], preserve[d] or increase[d] racial isolation." *See* OAC § 3301-89-03(B)(5). Ohio's history of purportedly race-neutral practices to perpetuate segregation in education—including the creation or altering of attendance zones, (DeMaria Dep. Ex. 8, (Diversity Recommendations Report), p. 44)—contextualizes and further sheds light on Hills & Dales's motivation to circumvent the Pre-Existing Safeguards.

Hills & Dales's history also supports the conclusion that its actions are motivated by a desire to transfer its territory to a significantly whiter, more affluent school district. Hills & Dales incorporated explicitly and, in some cases, purportedly neutral, racially discriminatory terms into its restrictive covenants, which it did not officially remove until 1994. Bowers Dep. Ex. 1, (Bowers Report), p. 13. As the fact that Hills & Dales still has 0 black residents suggests, this history is hardly confined to the distant past. Its ***current*** housing-related[22] policies, such as the strict enforcement of no-lease restrictive deeds, (Conley Dep. Ex. 4, (4/11/18 Council Minutes) at VILLAGE 0255, and opting out of receiving federal Housing and Urban Development funds,

---

[22] Indeed, Auditor Harold testified that he has heard from "***residents and realtors***" that Hills & Dales "want[ed] to move . . . to Jackson [Schools]." *See supra* at p. 10.

(Bowers Dep. Ex. 1, Bowers Report, p. 8-9), are consistent with a pattern of racial and socioeconomic exclusivity.[23]

Beyond these exclusionary practices, Hills & Dales's proffered reasons for the transfer (both now and in 2005) are nearly identical to the pretextual reasons behind the segregative actions in the Cleveland, Columbus, and Youngstown desegregation cases. (Bowers Dep. Ex. 1, Bowers Report, pp. 15-16). For example, in *Reed*, one of the reasons given for a segregative school assignment policy "was that access to . . . school from [a certain] area was obstructed by railroad tracks and streets with extremely heavy vehicular traffic," even though the city had similar "railroad tracks and traffic problems in other areas" without affecting school assignment. *Reed*, 422 F.Supp. at 764. In 2005, Hills & Dales argued that one of its reasons to transfer was the allegedly "shorter safer transportation route to the new [Jackson] high school," yet failed to take into account that **Plain Local's elementary and middle schools are**, respectively, 2.1 and 3.8 miles **closer to Hills & Dales than those in Jackson** Schools. *Id*. Jordan Decl. Ex. 4 (2005 R&R), p. 20. In the July 6 Letter, Hills & Dales claims that "as [its] children are forced to travel a greater distance to school, safety issues arise in transportation." (Peppard Dep. Ex. 15, (July 6 Letter) at VILLAGE 001650). Councilman Peppard testified that the transfer was "about the safety of [his] kids," whose bus "pick up location was located in a Y-intersection" that he believes is unsafe. (Peppard Dep. at 68-69, 184). Yet, his children were never involved in any accident, he is not "aware of any accidents involving the bus at the intersection" near the pick-up location, and he cannot identify "anything . . . that would support" his opinion that "there's a higher occurrence of

---

[23] Such "no-leasing occupancy restrictions" have been recognized as "effectively stymie[ing] racial integration" because "minorities and immigrants are significantly more likely to rent than buy." Andrea J. Boyack, *American Dream in Flux: The Endangered Right to Lease A Home*, 49 Real Prop. Tr. & Est. L.J. 203, 226 (2014). In 2018, the Black homeownership rate in Stark County was 36.4%, "far below the homeownership rate for Whites, which stands at 71.9%." Stark County HOME Consortium, Stark County Analysis of Impediments to Fair Housing Choice 2018 (Dec. 2018), *available at* https://starkcountyohio.gov/StarkCounty/media/RPC-Fair-Housing/AI_Final-Draft.pdf), p. 103.

accidents at the intersection where his children were picked up[.]" (*Id*. at 69-70). The reasons that Hills & Dales offered for urging the General Assembly to facilitate its transfer to Jackson Schools in the July 6 Letter are virtually identical to those already rejected as "not credible." A tenuous rationale is even more indicative of discriminatory intent when it has cloaked not just one, but "a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.

Moreover, the Fast-Track Transfer Statute itself is analogous to the facially neutral practice of establishing "optional attendance zones" that allowed white students in "transitional areas . . . with a means to avoid" schools that were becoming increasingly black. *See, e.g., Reed*, 422 F.Supp. at 736, 782. Indeed, in *Penick*, this Court found that optional attendance zones, including one that gave residents of "a small, white enclave on Columbus' predominantly black near-east side" that "had more in common, geographically and racially, with Bexley than with Columbus" the option to "escape attendance at black" schools, and "permitted them to attend white (or whiter)" schools, "had a substantial and continuing segregative impact upon" different schools. *Penick*, 429 F.Supp. at 244-47. The historical background here amply supports a finding that Hills & Dales's desire to transfer to Jackson Schools and the statute enacted for the purpose of allowing it to transfer were motivated, at least in part, by segregative intent.

> 3. *The legislative history, "procedural anomalies," and sequence of events leading to the enactment of the Fast-Track Transfer Statute and the Transfer Requests also support an inference of segregative intent.*

The "specific sequence of events" leading to the enactment of the Fast-Track Transfer Statute and the Transfer Requests demonstrates that Hills & Dales's conduct was motivated by its desire to transfer from Plain Local to a wealthier, overwhelmingly white school district, and the General Assembly ultimately acceded to its demand for "legislation that would facilitate a

26

transfer."[24]  (Schuring Written Dep. at p. 4).  As the Hills & Dales Timeline shows, the demographic shift in Plain Local led to a self-described "flight" or "exodus" of Hills & Dales students from Plain Local. Ex. 5 (Hills & Dales Timeline).  Hills & Dales has never complained about the quality of Plain Local's education, Jordan Decl. Ex. 4 (2005 R&R) p. 15, and Hills & Dales is yet to identify the reason why "[e]verybody has cleared out, it seems like, and it's just been an exodus." (Grabowsky Dep. Ex. 1, 2005 Hr'g Tr. Vol. I at 201).

Hills & Dales's desire to transfer to Jackson Schools was frequently discussed at Hills & Dales Council meetings and was known to Stark County elected officials and realtors. (Harold Dep. at 31:25-32:2, 63:5-16; Peppard Dep. at 98:15-21; 199).  Councilman Peppard knew that a transfer would be impossible under the Pre-Existing Safeguards and explicitly sought legislation to "facilitate a transfer" and deprive Plaintiffs of the Pre-Existing Safeguards.  (Schuring Written Dep. at Ans. Nos. at pp. 2-4; Ex. 5 (Hills & Dales Timeline)).

In 2019, while Hills & Dales continued its "review [of] options to be pursued" to transfer to Jackson Schools, (Conley Dep. Ex. 4, (2/13/19 Council Minutes) at DUNN 000017), HB 166 was introduced.  Ex. 5 (Hills & Dales Timeline).  The Fast-Track Transfer Statute was later inserted, deleted, and re-inserted into the must-pass budget bill at the behest of Hills & Dales.  Ex. 8 (Budget Development Process Timeline).  This ensured that there was no discussion or debate over the invidious Fast-Track Transfer Statute.

After the Senate struck the Fast-Track Transfer Statute from HB 166, Councilman Peppard called Sen. Schuring and Rep. Oelslager and, in his own words, "worked pretty tirelessly" with

---

[24] To support an inference that the Fast-Track Transfer Statute was motivated by race, Plaintiffs do not need to establish that the elected officials who acquiesced to Hills & Dales's demands shared Hills & Dales's discriminatory motives. Instead, an official act, such as the enactment of the Fast-Track Transfer Statute, "performed simply . . . to appease . . . discriminatory viewpoints . . . becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 931 F.Supp. 222, 243 (S.D.N.Y. 1996), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997).

Councilman Dunn to secure legislation that would allow Hills & Dales to transfer by "influenc[ing] members of the. . . [G]eneral [A]ssembly to include the language of 3311.242 in [HB] 166." (Peppard Dep. Ex. 13; Ex. 5 (Hills & Dales Timeline). On July 16, 2019, Rep. Oelslager successfully moved the Conference Committee to re-insert the language of the Fast-Track Transfer Statute into HB 166, Ex. 19 (7/16/19 Conf. Committee Tr.) ____, and Sen. Schuring personally called Councilman Peppard to give him the news. Ex. 5 (Hills & Dales Timeline).

On July 17, 2019, the General Assembly cast the final vote to pass a version of HB 166 that contained the text of the Fast-Track Transfer Statute, Ex. 23 (Certified Copy of HB 166)—a law that was never "discussed in subcommittee at all" and the General Assembly "didn't know which districts [it] would apply to or who was seeking it."[25] Ex. 26 (Cera Aff. Ex. 1, 9/20/19 Email at CERA000002). Indeed, Superintendent DeMaria testified multiple times throughout the budget development process, at no point even mentioning territorial transfers. Ex. 8 (Budget Development Process Timeline). The State Board did not learn about R.C. 3311.242 until "September of 2019." (Kohler Dep. at 86:20-89:8).

Hills & Dales wasted no time to petition to transfer to Jackson Schools under the Fast-Track Transfer Statute, assisted the State Board with the defense of "[its] legislation," and knew that "[t]iming truly [was] very important" and was "highly concerned" that the statute would "be removed from [the] ORC next year." (Peppard Dep. at 275; Peppard Dep. Ex. 21; Ex. 5 (Hills & Dales Timeline)). Further, Councilmen Peppard and Dunn implausibly attempted to minimize Hills & Dales's official involvement in securing what they referred to as "our legislation" in the "budget bill (HB166)." (Dunn. Dep. Ex. 19, Email to Mayor Samolczyk; Peppard Dep. Ex. 27)at

---

[25] Rep. Oelslager and Rep. Brinkman (who ultimately sponsored the Fast-Track Transfer Statute) both stated that they do not know how many Ohio school districts are affected. Brinkman Written Responses), p. 6; Oelslager Responses, p. 7.

PEPPARD 000093).  Likewise, as Councilman Peppard recognized, Sen. Schuring made "sure he [was] not too close to it."  *Id*.  Rep. Oelslager, who spoke with Councilman Peppard, W.R. Timken, and Roger DeVille regarding the statute, also denied his involvement with the statute to the press. *See, e.g.,* Ex. 27 (10/13/19 Canton Repository Article, *School territory transfer law: Who is behind it?*).  The "procedural anomalies" that the State Board has conceded, the legislative history, the lack of rationale, and the sequence of events leading to the enactment of the Fast-Track Transfer Statute and the Transfer Requests establish an inference of discrimination under *Arlington Heights*.

    4.    *The departures from substantive conclusions support an inference of segregative intent.*

In addition to the multiple procedural departures listed above, the Fast-Track Transfer Statute's departures from substantive conclusions support an inference of discrimination.  The most prominent substantive departure here is the Fast-Track Transfer Statute's unprecedented and standardless delegation of a State Board function to the very group of electors who stand to benefit from its implementation. (DeMaria Dep. at 138:7-19). Moreover, as *Amici* argued in their Brief in Support of Plaintiffs' TRO Motion ("Amici TRO Br."), ECF #60, the Fast-Track Transfer Statute inherently "creates substantial procedural and substantive departures from the normal procedure for school district territory transfers in Ohio," and "stymies Ohio's processes and procedures for rooting out and eliminating racially discriminatory transfers and for ensuring that Ohio's public school system does not encourage segregation."[26]  Amici TRO Br., pp. 8, 9-13.  The Fast-Track Transfer Statute is anathema to the State Board's: (1) Diversity Strategies Report; (2) Strategic Plan for Education;[27] (3) and July 2020 Resolution recognizing that "Ohio's education system has

---

[26] *See, e.g.,* Kohler Dep. 77-85, Ex. 9 Ex.  9  (Feb. 2019 Meeting Minutes), p. 18 (discussing State Board's deliberations surrounding decision to deny transfer request under the Pre-Existing Safeguards on the ground that it would increase racial segregation, cause a significant loss of funding, and "set[] precedent, [as] petitioners knew what district the house they purchased was in.").

[27] *See* DeMaria Dep. Ex. 7; DeMaria Dep. 125-126.

not been immune to" the "hard truths of racism and inequality," and that it "ha[s] a great deal of work left to do." Ex. 3 (7/13/2020 State Board's Equity Resolution), p. 1.

## II. **The Fast-Track Transfer Statute Is Not Rationally Related to Any Legitimate State Interest.**

The U.S. Constitution's equal protection guarantee mandates that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001). Setting aside the evidence of racially discriminatory intent, the right to Equal Protection "*safeguards* not merely *against* such invidious classifications as race, gender and religion, but *any arbitrary classification of persons for unfavorable governmental treatment*." *Hayden v. Grayson*, 134 F.3d 449, 453 n.3 (1st Cir. 1998) (emphasis added); *Allegheny Pittsburgh Coal Co. v. Cty. Com'n of Webster Cty., W. Va.*, 488 U.S. 336, 345 (1989).

"*The Equal Protection Clause safeguards against the disparate treatment of similarly situated individuals as a result of government action* that 'either burdens a fundamental right, targets a suspect class, or *has no rational basis*.'" *Paterek v. Village of Armada*, 801 F.3d 630, 649 (6th Cir. 2015) (emphasis added). Thus there must be some nexus between the end the government seeks to achieve and the classification through which it seeks to achieve it: "the relationship of the classification to its goal [may] not [be] so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). Because the Fast-Track Transfer Statute singles out students in public schools serving Eligible Townships for disfavored treatment, equal protection principles require the government to have a legitimate basis for doing so. A transparent "desire to" benefit "a discrete interest group" is "not a legitimate government purpose." *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002).

There is no legitimate justification for either depriving students in school districts that serve

"Eligible Townships" of the Pre-Existing Safeguards, or for giving communities that happen to be in Eligible Townships the unfettered right to transfer to another school district. No cognizable reason has yet been articulated for ***singling out*** students in "Eligible Townships" to deprive them of the rights that the Pre-Existing Safeguards are intended to protect.  To the contrary, the history and sequence of events leading to the enactment of the Fast-Track Transfer Statute show that the selective elimination of the Pre-Existing Safeguards will expose Plain Local students to the harm that those procedural safeguards are meant to prevent.  That same record shows that there is no basis to allow unfettered, standardless transfers by communities like Hills & Dales.

Rational "basis, while deferential, is not toothless." *Craigmiles*, 312 F.3d at 227 (quoting *People's Rights Org., Inc. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998)); *see also Bruner v. Zawacki*, 997 F. Supp. 2d 691 (E.D. Ky. 2014); *cf. Bokhari v. Metropolitan Gov't of Nashville and Davidson Cnty.*, 2012 WL 6018710 (M.D. Tenn. 2012) (denying summary judgment for the government on claims that limousine regulations lacked a rational basis).  There is no legitimate government interest served by singling out Plain Local students and those similarly situated in "Eligible Townships" to deprive them of the Pre-Existing Safeguards.  The arbitrary classifications that the Fast-Track Transfer Statute creates violate the equal protection.

## III. **The Fast-Track Transfer Statute and the Transfer Requests Violate Title VI and the EEOA.**

Hills & Dales's actions violated Title VI, which provides "a private cause of action for intentional discrimination with respect to participation in, or benefits of, program receiving federal financial assistance." *Pryor v. Nat'l Collegiate Athletic Ass'n.,* 288 F.3d 548, 562 (3d Cir. 2002). Intentional discrimination under Title VI can be established by application of the *Arlington Heights* criteria.  Because the undisputed evidence establishes intentional discrimination under the *Arlington Heights* framework, and because Hills & Dales stipulated that it is a recipient of federal

funds, Plaintiffs are entitled to summary judgment on their Title VI claim.

The EEOA prohibits "the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system," and "[t]he transfer by an educational agency, whether voluntary or otherwise, of a student from one school to another if the purpose and effect of such transfer is to increase segregation of students on the basis of race, color, or national origin among the schools of such agency." *United States v. Sch. Dist. of Ferndale, Mich.*, 577 F.2d 1339, 1347 (6th Cir. 1978) (citing 20 U.S.C.A. § 1703(b) and (e)). As established above, Ohio schools practiced segregation and the State Board enacted the Pre-Existing Safeguards to remove the vestiges of a dual, segregated school system. Further, the requested transfers have "the purpose and effect" of "increas[ing] segregation of students on the basis of race." *See supra* I.A(1). Therefore, the Fast-Track Transfer Statute and the Transfer Requests also violate the EEOA, and Plaintiffs are entitled to summary judgment on that claim as well.

**IV.     The Fast-Track Transfer Statute Violates Due Process.**

The Fast-Track Transfer Statute and the Transfer Requests violate Plaintiffs' constitutional rights to procedural due process. *See Goss v. Lopez*, 419 U.S. 565, 572 (1975).

**A.      Plaintiffs Have a Constitutionally Protected State-Created Property Interest.**

The "first question in any case in which a violation of procedural due process is alleged is whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of that interest." *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1190–91 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 52 (2016). The interests protected by the Due Process Clause "extend beyond tangible property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'" *Nozzi*, 806 F.3d at 1191 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77 (1972)). A "legitimate claim of entitlement" is "created and [its] dimensions are defined by" the

"state statutes or rules entitling [] citizen[s] to certain benefits." *Goss*, 419 U.S. at 572-73.[28]  An individual possesses a protected property interest if he or she has a reasonable expectation of entitlement to that interest. *Nozzi*, 806 F.3d at 1191.

The "dimensions" of the property interest at issue here "are defined by" the law governing public education and school district transfers in Ohio.  Under Article VI, Section 2 of the Ohio Constitution, Plaintiffs have a "protected property interest in a ***thorough and efficient system of education***." *See, e.g., Doe v. Ohio*, No. 2:91-CV-464, 2012 WL 12985973, at *11 (S.D. Ohio Feb. 16, 2012) (emphasis added); *DeRolph v. State*, 78 Ohio St. 3d 193 (1997).  With respect to "request[s] for transfer of territory" to another school district, Ohio law has, since 1987, ***required*** the State Board to scrutinize proposals "with ***primary consideration*** given to the present and ultimate good of the pupils concerned," *Concerned Citizens for Quality Edn. v. Ohio Dep't of Edn.*, 2011-Ohio-3081, ¶ 7 (citing OAC § 3301-89-02(F)) (emphasis added), and a "guarantee . . . that racial isolation concerns [will] be considered." *Cincinnati School Dist. v. Ohio Dept. of Edn.*, 2005-Ohio-1876.

The Pre-Existing Safeguards, which continue to govern many transfer requests in Ohio, require the State Board to determine, *inter alia*, that "[t]he [proposed] transfer shall not cause, preserve, or increase racial isolation" and "[t]he pupil loss of the relinquishing district should not be such that the educational program of the district is severely impaired."[29] OAC § 3301-89-03(B); 3301-89-02(D).  Unless "***all*** other factors are equal," the State Board ***may not*** consider "the preference of the residents . . . who live in the territory sought to be transferred." *Concerned*

---

[28] *See also United States v. Craft*, 535 U.S. 274, 122 S. Ct. 1414 (2002) ("A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property. State law determines which sticks are in a person's bundle.").

[29] The State Board must evaluate "the reason for the request, racial isolation, adequacy of resources and facilities, fiscal effects of a transfer, [and] effects of a transfer on educational and extracurricular offerings," and "give primary consideration to the present and ultimate good of all the students . . . affected by the proposed transfer." *Concerned Citizens for Quality Edn.*, 2011-Ohio-3081 at ¶ 7.

*Citizens for Quality Edn.*, 2011-Ohio-3081 at ¶ 7 (emphasis added).

The Pre-Existing Safeguards protect Ohio students against arbitrary transfers that will perpetuate or increase racial isolation and detrimentally impact the relinquishing district's fiscal stability, operations or programming. In tandem with the right to a free public education and to a "thorough and efficient system of common schools," the Pre-Existing Safeguards confer—and Ohio students enjoy—a legitimate claim of entitlement to an adequate and nondiscriminatory education. *See, e.g., Nozzi*, 806 F.3d at 1191 ("plaintiffs had a well-settled [state-created] property interest" where "statute [conferring housing benefits], in tandem with regulatory requirements restrict[ing] the discretion of the Housing Authority, protected against an abrupt and unexpected change in benefits"). That legitimate entitlement is a state-created property interest that is protected by the Due Process Clause, and it cannot "be taken away . . . without adherence to the minimum procedures required by that Clause." *Goss*, 419 U.S. at 574.

### B. The Fast-Track Transfer Statute Deprives Plaintiffs of a State-Created Property Interest in Violation of Due Process.

The Fast-Track Transfer Statute deprives Ohio students attending schools that serve an Eligible Township of a protected property interest ***without any process at all***. Due process principles require that individuals who risk losing a protected interest be given, at a minimum, "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation omitted). Due process requires balancing the private interest at stake—here, the right to an adequate and nondiscriminatory education—against "the risk of erroneous deprivation and the probable value of additional procedural safeguards" and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335. Here, the balancing is straightforward, as the Fast-Track Transfer Statute divests Plaintiffs of the historical

protections of the Pre-Existing Safeguards. First, a highly important private interest is at stake: the right to an adequate, nondiscriminatory education.[30]

Second, the "risk of erroneous deprivation" is unusually high, given the essentially unfettered power conferred on residents of Eligible Townships under the Fast-Track Transfer Statute.[31] The residents of an Eligible Township need not consider any other factors that bear on Plaintiffs' interest in an adequate and nondiscriminatory education. There are no procedural safeguards against racial, gender, or any other type of invidious discrimination in the process that the Fast-Track Transfer Statute creates.

Compounding this harm, the Fast-Track Transfer Statute divests every other person involved—including the State Board—of any discretion. The Fast-Track Transfer Statute does not advance any legitimate government interest, whereas allowing the Pre-Existing Safeguards to continue to protect *all* Ohio students will add no fiscal or administrative burden to the government.[32] In short, the State is required to provide sufficient procedural safeguards to guard against transfers that threaten Plaintiffs' right to an adequate and nondiscriminatory education. The Fast-Track Transfer Statute does the opposite.[33]

---

[30] *See Goss*, 419 U.S. 576 ("[E]ducation is perhaps the most important function of state and local governments.").

[31] By providing residents of an Eligible Township an essentially unfettered power to transfer to another school district, the Fast-Track Transfer Statute is also, in effect, a standardless "delegation of legislative authority" that "offends due process" because "it is made to an unaccountable group of individuals and is unaccompanied by 'discernible standards,' such that the delegatee's action cannot be 'measured for its fidelity to the legislative will.'" *Ctr. for Powell Crossing, LLC*, 173 F.Supp.3d 639, 676 (S.D. Ohio Mar. 25, 2016) (citing *Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 675 (1976)); *see also Carter v. Carter Coal Co.*, 298 U.S. 238 (1936); *Wash. ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121-22 (1928) (private actors "are free to withhold consent for selfish reasons or arbitrarily . . . The delegation of power so attempted is repugnant to the due process clause"); *Eubank v. Richmond*, 226 U.S. 137, 143-44 (1912).

[32] As applied to the 2019 Hills & Dales Request, the due process violation is particularly egregious given that the State Board already denied that same request under the Pre-Existing Safeguards. Absent the Fast-Track Transfer Statute, the State Board would be barred from even considering the 2019 Hills & Dales Request.

[33] For the reasons explained above, *supra* II, the Fast-Track Transfer Statute also violates Plaintiffs' substantive due process rights by singling them out for deprivation of the Pre-Existing Safeguards. "The touchstone of due process is protection of the individual against arbitrary action of the government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).

## V.   **The State Board Defendants Waived Eleventh Amendment Immunity.**

The State Board Defendants never asserted, and have waived, the Eleventh Amendment immunity defense.[34]   While *Pennhurst State School & Hospital v. Halderman*, recognized that state officers sued in federal court on state law claims may raise sovereign immunity as a defense, 465 U.S. 89, 117, 121 (1984), this defense is not absolute.   Where, as here, state officials "appear[] without objection and *defend[] on the merits* in a case over which the district court otherwise has original jurisdiction," they voluntarily invoke "the federal court's jurisdiction" and "waive [the] defense of Eleventh Amendment immunity." *Ku v. State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003) (emphasis added); *Nair v. Oakland County Community Mental Health Authority*, 443 F.3d 469, 474 (6th Cir. 2006) ("a State may waive Eleventh Amendment immunity through its own conduct: by […] appearing without objection and defending on the merits") (internal quotation omitted).  In *Hunter v. Hamilton County Board of Elections*, this Court found waiver where Board of Elections was "brought in involuntarily as a defendant," and—like the State Board Defendants—"[i]nstead of asserting its Eleventh Amendment immunity defense," it "defended the suit on the merits, participating in extensive pre-trial activities," raising "the defense for the first time in its motion for summary judgment . . . . " *Id*.  Likewise, if the State Board Defendants raise an Eleventh Immunity defense, they will do so at summary judgment, presumably based solely on the Court's *sua sponte* July 16, 2020 Order.[35]

## VI.   **The Fast-Track Transfer Statute Violates the One-Subject Rule of the Ohio**

---

[34] Hills & Dales cannot assert the defense of sovereign immunity, which does not "protect[] . . . state subdivisions such as" Hills & Dales. *McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 994 (6th Cir. 2019) (*Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890)).

[35] This action has been ongoing for over eight months and the State Board Defendants are yet to assert an Eleventh Amendment immunity defense.  The State Board Defendants have: entered two notices of appearance (*See* ECF Nos. 14 and 15); argued that this action, "much like the first lawsuit, is premature" (ECF No. 17 at PAGEID# 105-06); submitted a proposed joint scheduling order (ECF No. 30); answered the FAC asserting only **one** affirmative defense: "The Complaint fails to state a claim or cause of action against the Defendants for which relief may be granted" (ECF No. 33 at PAGEID# 299); opposed Plaintiffs' TRO Motion, arguing the merits of Plaintiffs' state constitutional claims (ECF No. 46 at PAGEID# 538); attended the February 25, 2020 TRO hearing and argued that the law does not violate

**Constitution.**

The Fast-Track Transfer Statute violates Article II, Section 15(D) of the Ohio Constitution, which states: "No bill shall contain more than one subject, which shall be clearly expressed in its title." Although the One-Subject Rule was once considered merely "directory," the Ohio Supreme Court has since made clear that the Rule is "mandatory." *See In re Nowak*, 104 Ohio St.3d 466, 2004-Ohio-6777, 820 N.E.2d 335 at ¶¶ 38, 46, 52-54. Accordingly, a violation of the One- Subject Rule will cause an enactment to be invalidated. *Id.*

Appropriations bills, like HB 166, "present[] a special temptation" to attach unrelated provisions, but the One-Subject Rule still applies. *Simmons-Harris v. Goff*, 711 N.E.2d 203 (citation omitted). Such bills appropriate funds for programs touching on many topics, but their provisions must nonetheless be "bound by the thread of appropriations." *OCSEA v. SERB*, 818 N.E.2d 688, at ¶ 30 (quoting *Simmons-Harris* at 16). Provisions in an appropriations bill must be directly related to budget and appropriations. *Id.* at ¶ 23. R.C. 3311.242 is invalid because it is unrelated to the state budget or appropriations, and there is no "practical, rational or legitimate reason[] for combining the provisions in one act." *In re Nowak*, 2004-Ohio-6777, 820 N.E.2d 335, ¶ 44.

In fact, the statute was the result of logrolling, precisely what the One-Subject Rule was intended to prevent. Logrolling is "the practice of combining and thereby obtaining passage for several distinct legislative proposals," known as riders, "that would probably have failed to gain majority support if presented and voted on separately." *See In re Nowak*, 104 Ohio St.3d 466, 2004-Ohio-6777, 820 N.E.2d 335 at ¶ 31 (citing *Sheward*, 86 Ohio St.3d at 495-96, 1999-Ohio-123, 715 N.E.2d 1062). R.C. 3311.242 was inserted in HB 166 as a rider, which undermines an

---

the One-Subject or Three-Readings Rule (ECF No. 64 at PAGEID# 882-83); signed the agreed order entered after the TRO hearing (ECF No. 64); participated in extensive discovery, etc.

"orderly and fair legislative process." *Dix,* 11 Ohio St.3d at 142-143, 464 N.E.2d 153. The One-Subject Rule accomplishes its goal of promoting a fair legislative process by "disallowing unnatural combinations of provisions in acts—those dealing with more than one subject, on the theory that the best explanation for the unnatural combination is a tactical one—logrolling." *Dix* at 143. Even a cursory review of HB 166 reveals that R.C. § 3311.242 was an impermissible rider: (1) its passage was the product of an unfair legislative process; (2) it comprises only a fraction of the HB 166; and (3) it is a controversial provision whose passage was assured by tucking it away in the must-pass appropriations bill.

## VII.  The Fast-Track Transfer Statute Violates the Three-Day Reading Rule of the Ohio Constitution.

Article II, Section 15(C) of the Ohio Constitution requires that "*[e]very bill shall be considered by each house on three different days* . . ." Ohio Const. Art. II, §15(C).  The language in Article II, Section 15(C) is mandatory. *See State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St.3d 225, 232 (1994) (citing *Hoover v. Bd of Cty. Commrs., Franklin Cty*, 19 Ohio St.3d 1 (1985)). The requirement applies where, as in this instance, an amendment "vitally alter[s] the substance of a bill," in which case "the amended bill" must be read "three times, and on different days." *Hoover*, 19 Ohio St.3d at 5.  Neither the House, nor the Senate considered the Fast-Track Transfer Statute on three separate days.  *See supra* at pp. 11-13. As explained in the preceding section, the Fast-Track Transfer Statute's purpose is different from the budget bill's, which vitally altered the bill and "chang[ed] the law on transfers." (Kohler Dep. pp. 86-87).  Accordingly, any consideration of HB 166 when it did not include the Fast-Track Transfer Statute is irrelevant. *See Ohio AFL-CIO*, 69 Ohio St.3d at 233.  The failure to consider the statute on three separate days in the House violates the Ohio Constitution, and therefore it must be stricken.

## VIII.  The Court Should Invalidate R.C. 3311.242 and Permanently Enjoin the State Board

**from Implementing it or Approving the Transfer Requests.**

A law that, like R.C. 3311.242, is enacted with discriminatory intent must be invalidated and declared unconstitutional. *See McCrory*, 831 F.3d at 240 ("laws passed with discriminatory intent inflict a broader injury and cannot stand"); *id.* at 238 ("When discriminatory intent impermissibly motivates the passage of a law, a court may remedy the injury — the impact of the legislation — by invalidating the law"). Because, as established above, the Fast-Track Transfer Statute was enacted for the purpose of accomplishing Hills & Dales's intentionally segregative transfer to Jackson Schools and in violation of Plaintiffs' constitutional and civil rights, the Court should enter declaration invalidating the Fast-Track Transfer Statute and the Transfer Requests.[36]

In addition, the Court should permanently enjoin the implementation of the unconstitutional Fast-Track Transfer Statute, including the Transfer Requests submitted pursuant to it. *See Doe*, 657 F.2d at 1025 ("having declared the statutory scheme unconstitutional . . . the district court was empowered under 28 U.S.C. s 2202 to" enter a permanent injunction "to effectuate the judgment . . ."); *see also Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 466, 471, 487 (1982) (affirming permanent injunction of state measure "effectively drawn for racial purposes" in violation of the Fourteenth Amendment). Absent an injunction, Plaintiffs' will be irreparably harmed because, as detailed above, the Fast-Track Transfer Statute and the Transfer Requests will significantly—and permanently—impair Plain Local's ability to serve a student body that, without the Pre-Existing Safeguards, will become increasingly segregated.[37] Indeed,

---

[36] *See, e.g., Doe v. Gallinot*, 657 F.2d 1017, 1025 (9th Cir. 1981) ("[T]his case seems an entirely appropriate one in which to exercise the discretion to render a declaratory judgment on the constitutionality of the challenged statutory provisions.").

[37] As this Court recently reiterated, "[i]rreparable harm is presumed as a matter of law" where, as here "a moving party shows 'that a constitutional right is being threatened or impaired.'" *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F.Supp.3d 850, 877–78 (S.D. Ohio 2016) (quoting *Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and

over sixty years of binding, United States Supreme Court precedent holds that segregated schools violate the Fourteenth Amendment and emphasizes that segregation is *per se* irreparable harm **to the minority group**. *Brown v. Bd. of Educ.*, 347 U.S. 483, 493-95 (1954); *Kelley v. Metro. County Bd. of Educ.*, 687 F.2d 814, 822 (6th Cir. 1982) (citation omitted) ("black students, particularly in the elementary grades, suffer irreparable harm from the maintenance of a segregated school system"); *Bd. of Educ. of the Highland Local Sch. Dist.*, 208 F.Supp.3d at 878.

## CONCLUSION

For any or all of the reasons above, Plaintiffs respectfully request that the Court enter judgment in their favor on all of their claims and issue a declaratory judgment that the Fast-Track Transfer Statute was enacted and the Transfer Requests were made, at least in part, with discriminatory intent, and Defendants cannot prove that the Fast-Track Transfer Statute would have been enacted and the Transfer Requests would have been made without that intent. Plaintiffs further respectfully request that the Court permanently enjoin the ongoing implementation of R.C. 3311.242, including approval of the Transfer Requests and any transfers from Plain Local pursuant to the statute, and award Plaintiffs their fees and costs under 42 U.S.C. § 1988.

---

Procedure § 2948.1 (2d ed. 1995) ("[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").

Respectfully submitted,

/s/ *Amanda Martinsek*
Amanda Martinsek (0058567)
William D. Edwards (0062861)
Daniela Paez (0091212)
Gregory C. Djordjevic (0095943)
ULMER & BERNE LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
216-583-7000 / Fax: 216-583-7001
Email: amartinsek@ulmer.com
Email: wdedwards@ulmer.com
Email: dpaez@ulmer.com
Email: gdjordjevic@ulmer.com

Rex A. Littrell (0042419)
Rachael Rodman (0073872)
ULMER & BERNE LLP
65 East State Street, Suite 1100
Columbus, Ohio 43215-4213
614-229-0000 / Fax: 614-229-0001
Email: rlittrell@ulmer.com
Email: rrodman@ulmer.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 27, 2020, a copy of the foregoing was filed electronically and

sent to all counsel of record by operation of the Court's CM/ECF System.


<u>/s/ Amanda Martinsek</u>
One of the Attorneys for Plaintiffs