## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Plain Local School District
Board of Education, *et al.*,

        Plaintiffs,                          Case No. 2:19-cv-5086

        v.                                 Judge Michael H. Watson

Mike DeWine, *et al.*,                    Magistrate Judge Vascura

        Defendants.

## OPINION AND ORDER

In this action, Plaintiffs challenge, under both federal and state law, Ohio Revised Code § 3311.242, which they refer to as the "Fast-Track Transfer Statute."[1] Plaintiffs now move for summary judgment on their claims.[2] ECF No. 129. Defendants oppose Plaintiffs' motion and separately move for summary judgment. ECF Nos. 137 & 138. Additionally, Ohio School Boards Association and Ohio Education Association ("Movants") move for leave to file an *amicus curiae* brief. ECF No. 60. Finally, Defendant Village of Hills and Dales ("Hills and Dales") moves to amend the parties' prior Agreed Order regarding Plaintiffs' motion for a temporary restraining order. ECF No. 104.

---

[1] For simplicity, the Court will do the same.

[2] The Court intended to hold a combined preliminary and permanent injunction hearing, after which it would issue its merits decision. Due to COVID-19 and an inability to hold in-person hearings, all parties agreed to submit the matter to the Court in writing, via motions for summary judgment, instead. To the extent the Court would have needed to resolve any disputed issues of fact, the filings perhaps should have been styled as trial briefs. Because the Court rules as a matter of law, it is appropriate to continue to call them summary judgment briefs and apply the summary judgment standard.

For the following reasons, Movants' motion for leave to file an *amicus curiae* brief is **GRANTED**. The State Board Defendants' motion for summary judgment is **DENIED WITH PREJUDICE IN PART AND DENIED WITHOUT PREJUDICE AS MOOT IN PART**. Hills and Dales' motion for summary judgment is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE AS MOOT IN PART**. Plaintiffs' motion for summary judgment is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE AS MOOT IN PART**. Hills and Dales' motion to amend the Agreed Order is **DISMISSED AS MOOT**.

## I. FACTS

Hills and Dales is an incorporated village in Stark County, Ohio. Ans. ¶ 26, ECF No. 34. It is located entirely within Jackson Township. McKibben Dep. Ex. 1 at 6, ECF No. 144-1 at PAGEID # 20131. In 1954, Hills and Dales had the opportunity to choose which public school system to join; it chose Plaintiff Plain Local School District.

Over the years, Plain Local School District's student body has become more diverse. Plain Local School District's student body was 94% white in 2000. Martinsek Decl. at 3, ECF No. 110; *id.* at Ex. 23, ECF No. 111-8 at PAGEID # 13194. By 2005, Plain Local School District reported its student body as 86.1% white and 13.9% minority. Jordan Decl. Ex. 1, ECF No. 108. That same year, Jackson Local School District's student body was reported as being 94.4% white and 5.6% minority. *Id.* By 2019, Plain Local School District was 71.96% white and 28.04% minority while Jackson Local School District was 87.07% white and

12.93% minority. Rausch Dep. Ex. 5, ECF No. 118 at PAGEID # 14562. Thus, over the past 15 years, Plain Local School District's student body has diversified faster than Jackson Local School District's. Moreover, in fiscal year 2019, the State of Ohio categorized 42.37% of students in Plain Local School District as "Disadvantaged." Rausch Dep. Ex. 5, ECF No. 118 at PAGEID # 14562. That same year, it categorized only 16.26% of Jackson Local School District's students as "Disadvantaged." *Id*.

Over the past twenty years, Hills and Dales has remained overwhelmingly white. The 2000 census showed that Hills and Dales was 95% white and 5% minority (including 0.4% black). Jordan Decl. Ex. 4, ECF No. 108 at PAGEID # 2025. By 2010, Hills and Dales was 92.8% white and 7.2% minority (including 0% black residents). Martinsek Decl. Ex. 6 at 2, ECF No. 110 at PAGEID # 2489.

In 2004, Hills and Dales attempted to transfer from Plain Local School District to Jackson Local School District. Jordan Decl. ¶¶ 5–8, ECF No. 109; *id.* at Ex. 5, ECF No. 109 at PAGEID ## 2042–44. At that time, there were only two mechanisms for transferring territory between school districts: Ohio Revised Code Sections 3311.06 and 3311.24. Hills and Dales attempted to transfer pursuant to § 3311.24. *Id.* at ¶ 5.

All transfers under § 3311.24 had to be approved by the State Board of Education ("State Board") and were governed by Ohio Administrative Code § 3301-89, *et seq.* O.R.C. § 3311.24(A) (2005); Ohio Admin. Code § 3301-89-

01(A) (2005).[3]  The State Board's primary consideration in deciding whether to approve a transfer request was "the present and ultimate good of the pupils concerned."  Ohio Admin. Code § 3301-89-01(F) (2005).  In making that determination, the State Board (and a hearing officer if a hearing was held) had to consider the affected school districts' answers to the following pertinent questions:

> (1) Why is the request being made?
> (2) Are there racial isolation implications?
> . . .
> (9) Will the loss of either pupils or valuation be detrimental to the fiscal or educational operation of the relinquishing school district?
>  . . .

Ohio Admin. Code § 3301-89-02(B) (2005).

A hearing officer was appointed and presided over a two-day hearing regarding Hills and Dales' 2004 transfer petition.  Jordan Dec. ¶ 6, ECF No. 109; *id.* at Exs. 2–3, ECF No. 109 at PAGEID ## 1540–2012.  In support of the transfer petition, Hills and Dales argued that it identified with the Jackson Local community, the Jackson Local high school was closer to Hills and Dales than was the Plain Local high school, and travel to Jackson Local schools would be safer than travel to Plain Local schools.  *E.g.* Jordan Dec. Ex. 2 (Hrg. Tr. 11:22–12:3; 13:7–14:4; 16:13–17:5), ECF No. 109 at PAGEID ## 1550–51.  Plain Local School District challenged the transfer attempt, arguing that it would erode Plain

---

[3] Although the transfer petition was submitted in 2004, the decision was rendered in 2005.  All pertinent statutory provisions were identical in 2004 and 2005, and the Court cites the 2005 version as that was in effect at the time the decision was rendered.

Local School District's finances and diversity and open the floodgates for future transfer petitions. *Id.* at PAGEID # 1562.

In addition to considering the testimony, exhibits, and information submitted by the parties, including the statutory questions listed above, the hearing officer was required to also consider these pertinent concerns before issuing her recommendation to the State Board:

> (5) The transfer shall not cause, preserve, or increase racial isolation;
> . . .
> (8) The pupil loss of the relinquishing district should not be such that the educational program of that district is severely impaired;
> . . .

Ohio Admin. Code § 3301-89-03(B) (2005).

The hearing officer recommended the State Board deny the proposed transfer as denial was "in the best interest of children." Jordan Dec. Ex. 4 (2005 R&R), ECF No. 109 at PAGEID # 2017. She found that the transfer "would result in Hills and Dales Village transferring from a more racially and socio-economically diverse to a less racially and socio-economically diverse school district," although the change due to the Hills and Dales transfer, alone, "would not be considerable." *Id.* at PAGEID # 2030. Nonetheless, "transferring the highest income white territory of Plain Local to the wealthier and less racially and socio-economically diverse Jackson Local district," she concluded, "implicate[d] the racial impact concerns about territory transfers that The Department of Education" included in Ohio Revised Code § 3311.24 and Ohio Administrative Code § 3301-89, *et seq. Id.* at PAGEID ## 2031–32. Those racial and socio-

economic implications, coupled with "the negative financial consequences" to Plain Local School District as well as Hills and Dales' "failure to prove their community, time, safety, and distance contentions"[4] led the hearing officer to recommend denial. *Id.* at PAGEID ## 2031, 2033–34, 2037–39.

The State Board adopted a resolution accepting that recommendation and denying the transfer request, Jordan Dec. Ex. 5, ECF No. 109 at PAGEID # 2044, and court challenges to the State Board's determination were dismissed. *Hills & Dales v. Ohio Dep't of Edu.*, No. 06AP-1249, 2007 WL 2812988 (Ohio Ct. App. Sept. 28, 2007); *appeal not accepted for review*, 117 Ohio St. 3d 1424 (2008).

Since then, Hills and Dales, primarily through Councilmen David Peppard and Patrick Dunn, has continued to search for a way to transfer to the Jackson Local School District. Peppard Dep. 90:4–11, 91:5–99:14, 103:11–104:16, 113:25–114:20, 201:8–202:10, ECF No. 123 (testifying the topic was raised approximately once per quarter from 2016 to 2019 and Patrick Dunn was researching in 2019 the possibility of a transfer); Dunn Dep. 74:22–84:10, ECF No. 122. These efforts included proposing a land swap between Jackson Township and Plain Township and requesting legislation to facilitate a transfer.

---

[4] The hearing officer found that Hills and Dales' professed "affinity" with and community involvement in Jackson Township was not credible and would not be enhanced by a transfer to that school district as the majority of Hills and Dales residents sent their children to private schools and did not testify that they would switch to Jackson Local schools if the transfer was approved. *Id.* at PAGEID ## 2017, 2039.

*See generally id.*; Schuring Dep. 4, ECF No. 119. In 2018, Hills and Dales surveyed its residents to gauge their interest in transferring to Jackson Local School District. Martinsek Decl. Ex. 21, ECF No. 110 at PAGEID ## 10581–85. However, the State Board could not reconsider a renewed transfer request under Ohio Revised Code § 3311.24 unless it determined "that significant change ha[d] taken place subsequent to the filing of the original request." Ohio Admin. Code § 3301-89-01(E). This provision effectively foreclosed transfer under § 3311.24 because it is undisputed that no significant change had occurred since the 2004 request.

A different opportunity to transfer arose in connection with the 2019 biennial budget process, however. In June 2019, Stark County Auditor Alan Harold[5] presented Councilman Peppard with the proposed language of § 3311.242, the Fast-Track Transfer Statute.[6] Peppard Dep. 108:7–15, 109:15–17, 112:22–113:3, ECF No. 123; Harold Dep. 61:9–12, ECF No. 114. Councilman Peppard learned that the language would provide a new mechanism

---

[5] Mr. Harold had been aware of the residents' (and realtors') of Hills and Dales desire to transfer to Jackson Local School District since he first took office in 2011. Harold Dep. 31:25–32:1, 63:6–16, ECF No. 114.

[6] The author of the challenged statute is in dispute. State Representative Thomas Brinkman claims responsibility for "spearheading" the proposal but not necessarily for writing it. Brinkman Dep. 2, ECF No. 124. However, Plaintiffs and certain staff at the State Board of Education believe the proposal was the work of State Representative Scott Oelslager and was offered specifically to benefit Hills and Dales. Rausch Dep. 23:15–20, ECF No. 118; Reply 8, ECF No. 154. Regardless, it is undisputed that, as soon as Hills and Dales became aware of the proposed language, it vigorously lobbied for its passage. *E.g.*, Peppard Dep. Ex 23, ECF No. 123 at PAGEID # 15411.

to effectuate transfers between school districts and that it had been included in the Ohio House's version of the biennial budget (House Bill 166) but was removed from the Senate's version of the bill.[7] *See* Peppard Dep. 110:17–25, ECF No. 123; Harold Dep. 66:3–68:14, ECF No. 114; Harold Dep. Ex. 3, ECF No. 114 at PAGEID ## 13787–90.

Within the week, Councilman Peppard began lobbying for the language to be reinserted into the appropriations bill. He emailed prominent real estate developer Roger DeVille and Mayor Mark Samolczyk and called Senator Schuring, Representative Oelslager, and Village Councilman Patrick Dunn about the proposal. Peppard Dep. 112:22–113:24, 117:7–10, 198:17–19, 212:5–213:18, 220:6–7, 222:2–6, ECF No. 123; *id.* at Ex. 13, ECF No. 123 at PAGEID # 15380. He asked Roger DeVille to call anyone on the Conference Committee that Mr. DeVille knew and to push for reinsertion of the statute. Peppard Dep. 216:2–17, ECF No. 123. Senator Schuring encouraged Councilman Peppard to contact Representative Oelslager and to write a letter to the Conference Committee expressing Hills and Dales' support for the statute's inclusion in the appropriations bill. *Id.* at 117:17–119:18. Representative Oelslager also encouraged Councilman Peppard to write a letter. *Id.* at 238:3–6.

---

[7] As the details surrounding the Fast-Track Transfer Statute's insertion and removal from the appropriations bill at various points in the legislative process are relevant to the Court's analysis, those details will be set forth *infra*.

On July 6, 2019, Councilman Peppard, Councilman Dunn, and other Hills and Dales residents sent a letter to the Conference Committee requesting the re-insertion of the Fast-Track Transfer Statute in the appropriations bill.  Peppard Dep. Ex 15, ECF No. 123 at PAGEID ## 15391–92.  The next day, Councilman Peppard emailed a request to members of the community asking them to lobby anyone they knew on the Conference Committee to re-insert the language but to "not publicize" their efforts "within the neighborhood."  *Id.* at PAGEID # 15387.

On July 16, 2019, Representative Oelslager orally moved to reinsert the Fast-Track Transfer Statute, and that motion was approved by a vote of four to two.  The Fast-Track Transfer Statute was therefore reinserted into the Conference Committee's version of the bill.  Conference Committee hearing 7/16/2019 at 36:09–36:26, available at http://www.ohiochannel.org/video/conference-committee-7-16-2019-am-sub-h-b-no-166?start=2166.  The Conference Committee reported the appropriations bill back to the legislature, which then passed it the next day.  Martinsek Decl. Ex. 24, ECF No. 111-8 at PAGEID ## 13196–209.  Governor Mike DeWine ("Governor DeWine") then signed it into law.

Although it did not replace the then-existing transfer statutes (Ohio Revised Code §§ 3311.06 and 3311.24), the Fast-Track Transfer Statute radically changes the school district transfer procedures by adding a new mechanism for effectuating such a transfer.  It permits electors residing in a

territory[8] within an "eligible township"[9] to virtually ensure a transfer to an adjoining school district. O.R.C. § 3311.242.

The transfer process begins by collecting petition signatures equal to at least 10% of the total electors, in the territory to be transferred, who voted in the last general election. *Id*. § 3311.242(C). For a small territory, this could be no more than one or two households. *See* May Decl. ¶ 6, ECF No. 108 at PAGEID # 1519. After receiving the petitions, the Board of Education losing the territory in the proposed transfer then must file the proposal (along with a map) with the State Board and certify the proposal to the county Board of Elections. O.R.C. § 3311.242(B)(1)-(2).

If the county Board of Elections determines the petition contains the requisite number of valid signatures, it must conduct an election on the proposal among the qualified electors of the territory to be transferred. O.R.C. § 3311.242(C), (D). If the proposed transfer receives an affirmative simple majority vote from the electors residing in the area to be transferred, the local

---

[8] Curiously, "territory" is not defined in the Fast-Track Transfer Statute. Here, Hills and Dales is attempting to transfer as an entire entity, but there is no reason to think individual property owners could not consider themselves a "territory" and attempt a transfer on their own. In other words, the transfer essentially becomes self-executing any time the would-be transferee lives in an eligible township because only those persons who live in the "territory" seeking to transfer get to vote on the transfer, *see* Schuring Dep. Ex. 1b, ECF No. 119 at PAGEID # 14587, and the statute does not prohibit gerrymandering the "territory to be transferred" to ensure a favorable electoral outcome.

[9] An "eligible township" is any "township that contains the territory or two or more school districts." O.R.C. § 3311.242(A)(1).

Board of Education losing territory must notify the State Board of the results, and the township trustees of the eligible township "must enter into negotiations with the board of education of the district to which the territory is being transferred regarding the terms of the proposal to transfer the territory." *Id*. § 3311.242(D), (E)(1)-(2).

If a transfer agreement is reached, the State Board must approve the transfer.[10] *Id*. § 3311.242(F)-(G). The State Board has no discretion to disapprove the transfer, even if it would contravene the public policies contained in Ohio Revised Code § 3311.24 and Ohio Administrative Code § 3301-89, *et seq.*, such as by resulting in increased racial isolation or a negative financial impact on the school district losing the territory *See generally* O.R.C. § 3311.242. Moreover, in the entire process, the school district losing territory in the transfer has no ability to protest or prevent the transfer. *Id*.

On September 23, 2019, Plain Local School District filed a lawsuit in this Court seeking to enjoin the Fast-Track Transfer Statute and any transfer of Hills and Dales to Jackson Local schools. *Plain Local School Dist. Bd. of Educ. v. DeMaria*, S.D. Ohio Case No. 19-cv-4246, ECF No. 1. However, the statute did

---

[10] It is questionable if even the required transfer agreement presents any meaningful barrier to completion. The Legislative Service Commission has noted "it is unclear whether the transfer may proceed without an agreement." Ohio Legislative Service Commission – H.B. 166 of the 133rd General Assembly (September 20, 2019), *available at*
https://www.lsc.ohio.gov/pages/budget/current/CurrentGA.aspx?Budget=MainOperating&ID=MainOperating&Version=contentFI

not go into effect until October 17, 2019, and there was no pending transfer proposal. After discussions with the Court on the questions of ripeness and imminent harm, *id*. at ECF No. 7, Plaintiffs chose to voluntarily dismiss the action without prejudice. *Id*., ECF No. 9.

On October 29, 2019, Hills and Dales submitted to Plain Local School District seventy-five petition signatures requesting a vote on the March 17, 2020 ballot regarding the transfer of the territory of Hills and Dales to Jackson Local School District.[11] May Decl. ¶ 5, ECF No. 108; *id*. at Ex. 1, ECF No. 108 at PAGEID ## 1496–1516. On November 6, 2019, Plain Local School District received another transfer petition, this time seeking to transfer territory in Irondale Circle in North Canton, Ohio, to the North Canton School District. May Decl. ¶ 6, ECF No. 108; *id*. at Ex. 2, ECF No. 108 at PAGEID ## 1518–19.

Plain Local School District[12] thereafter filed the current lawsuit. *Plain Local School Dist. Bd. of Edu. v. DeWine*, Case No. 2:19-cv-5086, Compl., ECF No. 1. Plaintiffs filed suit under federal and state law, arguing the transfer proposals are motivated by a desire to transfer from a more racially and socio-economically diverse school system to one that is richer and whiter. Plaintiffs sued Governor

---

[11] As of 2019, only five students attended Plain Local schools that live in the Village of Hills and Dales. McKibben Decl. Ex 1 at 6, ECF No. 144-1 at PAGEID # 20131. Any transfer would, however, affect the property taxes for the entire transferred territory of Hills and Dales.

[12] Additional plaintiffs in this lawsuit include several students of Plain Local School District, C.I., J.I., B.H., and C.H., by their next of friend and parents. Compl., ECF No. 1.

DeWine, Superintendent of Public Instruction and Secretary of the State Board Palo DeMaria ("Superintendent DeMaria"), various members of the State Board,[13] various members of the Stark County Board of Elections,[14] and Hills and Dales.

At some point, Hills and Dales then filed a lawsuit before the Supreme Court of Ohio seeking to force Plain Local School District to implement the Fast-Track Transfer Statute procedures. After an expedited state-court lawsuit, on January 9, 2020, the Supreme Court of Ohio issued a writ of mandamus requiring Plain Local School District to submit the petition signatures to the Stark County Board of Elections for review. *State ex rel. Dunn v. Plain Local Sch. Dist. Bd. of Educ.*, 158 Ohio St. 3d 370, 374 (2020). Then on February 3, 2020, the Supreme Court of Ohio issued another writ of mandamus, this time to the Stark County Board of Elections, ordering it to review the petitions for potential placement on the March 17, 2020 ballot. *State ex rel. Dunn v. Plain Local Sch. Dist. Bd. of Educ.*, 159 Ohio St. 3d 139, 145 (2020). Neither of these Ohio cases considered the merits of Plaintiffs' claims.

---

[13] Those members are Laura Kohler, Charlotte McGuire, Linda Haycock, Kirsten Hill, Jenny Kilgore, Lisa Woods, Antoinette Miranda, Sarah Fowler, John Hagan, Stephanie Dodd, Nick Owens, Meryl Johnson, Eric Poklar, Cindy Collins, Mark Lamoncha, Martha Manchester, Mike Toal, Steve Dackin, and Reginald Wilkinson. Compl., ECF No. 1.
[14] They are Samuel J. Ferruccio, Jr., Frank C. Braden, Williams S. Cline, Dimitrios Pousoulides. Compl., ECF No. 1. Plaintiffs voluntarily dismissed these defendants after the transfer proposal was voted on. Mot. Dismiss, ECF No. 85.

This Court declined to enjoin the transfer proposals from appearing on the March 17, 2020 primary ballot.  Agreed Order, ECF No. 63.  Hills and Dales voted 150 to 5 in support of transferring from Plain Local School District to Jackson Local School District, and Irondale Circle voted 13 to 1 in favor of transferring from Plain Local School District to North Canton School District. Jordan Decl. Ex. 14, ECF No. 109 at PAGEID ## 2441–43.  As required by law, Plain Local School District submitted those results to the State Board.  Jordan Decl. ¶ 19, ECF No. 109.

Per the Agreed Order, ECF No. 63, no Defendant has taken any further action to complete the transfers.  Having received full briefing on the merits of Plaintiffs' claims, the case is ripe.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law. The fact that one party fails to satisfy that burden on his or her own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on

the other motion.  In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation.  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

### III.    ANALYSIS

#### A. Sovereign Immunity

This case involves federal constitutional questions, federal statutory questions, and state constitutional questions.  The Court has original jurisdiction over those claims that raise a federal question.  28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the state-law claims.  28 U.S.C. § 1367.  The State Board Defendants, however, contend that they are entitled to sovereign immunity on Plaintiffs' state-law claims.

Ordinarily, "a federal court may resolve a case solely on the basis of a pendent state-law claim and . . . in fact the court usually should do so in order to avoid federal constitutional questions."[15]  *Pennhurst State Sch. & Hosp. v.*

---

[15] Even before *Siler*, the Supreme Court applied this principle, avoided federal issues altogether (even where the federal issues were the "main—almost the only—questions discussed by counsel"), and ruled instead on the claim that a defendant's action violated the state constitution. *Santa Clara Cty. v. S. Pac. R. Co.*, 118 U.S. 394, 410 (1886).  As the Court finds *infra* that *Pennhurst* poses no bar to this Court's supplemental jurisdiction and does not undermine the avoidance principle, this Court also chooses to

*Halderman*, 465 U.S. 89, 117 (1984) (citing *Siler v. Louisville & N.R. Co.*, 213 U.S. 175, 191 (1909)). Because the answer to Plaintiffs' state-law, one-subject rule claim is straightforward and would avoid the necessity of reaching the thornier federal statutory and constitutional claims, the Court would ordinarily address the merits of that claim without further ado.

But supplemental jurisdiction can collide with constitutional restrictions on federal jurisdiction, such as here—when a party files suit in federal court against a state official in his official capacity for a violation of state law. *Pennhurst*, 465 U.S. at 120. Such tension arises because the Eleventh Amendment typically bars a federal court from granting even prospective injunctive relief against state officials based on a violation of state law, even if the court would otherwise have supplemental jurisdiction over the state-law claim. *Pennhurst*, 465 U.S. at 106, 120–21; *Oneida Cty., N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 251 (1985); *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541–42 (2002).

The State Board Defendants assert, for the first time in their cross-motion for summary judgment, sovereign immunity over Plaintiffs' state-law claims. ECF No. 135 at PAGEID ## 18718–21. They contend there is no problem in waiting to assert sovereign immunity until this late stage because, they argue, sovereign immunity can be asserted at any point in the litigation, including for the first time on appeal. *Id.* (citing *Edelman v. Jordan*, 415 U.S. 651, 677–78 (1974)).

---

rule on a state constitutional claim even though the parties focused on the federal claims.

It is true that earlier Supreme Court opinions appeared to liken sovereign immunity somewhat to subject-matter jurisdiction. Those cases stated that sovereign immunity is jurisdictional and therefore can be raised at any time— including for the first time on appeal. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 677–78 (1974) ("[T]he Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." (citation omitted)); *Pennhurst*, 465 U.S. at 99 n.8 ("The limitation deprives federal courts of any jurisdiction to entertain such claims, and thus may be raised at any point in a proceeding.").

At the same time, the Supreme Court has repeatedly recognized that sovereign immunity is not absolute and that a state can waive sovereign immunity and consent to suit in federal court. *E.g., Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) (noting that, more than one hundred years ago, the Supreme Court had "indicated that a State's voluntary appearance in federal court amounted to a waiver of its Eleventh Amendment immunity" (citation omitted)); *Pennhurst*, 465 U.S. at 99. In this sense, sovereign immunity is unlike subject-matter jurisdiction, which can never be waived. *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 393 (1998) (Kennedy, J., concurring).

In fact, the Sixth Circuit has recognized that although sovereign immunity has qualities of both personal- and subject-matter jurisdiction, "the Supreme Court is moving in the direction of concluding that, in cases where the district court otherwise has original jurisdiction over the matter, the Eleventh Amendment

immunity defense should be treated in the same way courts have traditionally treated personal jurisdiction rather than as a matter of subject matter jurisdiction." *Ku v. State of Tenn.*, 322 F.3d 431, 432 (6th Cir. 2003); *cf. Schacht*, 524 U.S. at 391–92 (recognizing the Supreme Court had not, by 1998, answered whether sovereign immunity was a matter of subject-matter jurisdiction). Thus, despite the broad pronouncements in *Edleman*, etc., that sovereign immunity can be raised at any time in litigation, once affirmatively waived, it cannot later be reasserted. The question then becomes whether the State Board Defendants waived sovereign immunity in this case before asserting it in their cross-motion for summary judgment.

A state can waive its sovereign immunity through its litigation conduct— i.e., by "appearing without objection and defending [the suit] on the merits." *Ku*, 322 F.3d at 435; *Nair*, 443 F.3d at 476 (sovereign immunity "may be altered by the parties' litigation conduct"); *Lawson v. Shelby Cty., Tenn.*, 211 F.3d 331, 334 (6th Cir. 2000) ("Consent may also take the form of a voluntary appearance and defense on the merits in federal court." (citation omitted)); *cf. Schacht*, 524 U.S. at 390. The Supreme Court has also acknowledged waiver by litigation conduct and explicitly found such a waiver in *Lapides*, 535 U.S. at 620, although it limited its holding to the narrow facts in that case.[16]

---

[16] The Supreme Court's specific holding in *Lapides* was that, where a plaintiff brings state-law claims against state officials in their official capacities, and the state has explicitly waived its immunity from suit on those claims in *state* court, the state waives

The State Board Defendants argue that a finding of waiver in this case would amount to a finding of "constructive waiver," which the Supreme Court decried in *Coll. Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999). But in *Lapides*, the Supreme Court distinguished between waiver via litigation conduct and an impermissible "constructive waiver," finding no problem with the former. *See Lapides*, 535 U.S. at 620 ("[A]n interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages." (citation omitted)). Waiver by litigation conduct therefore satisfies the requirement that a state provide a "clear" indication of its intent to waive immunity, but "[t]he relevant 'clarity' here . . . focus[es] on the litigation act the State takes that creates the waiver." *Id.*;[17] *Barachkov v. Davis*, 580 F. App'x 288, 299 (6th Cir. 2014) ("[T]he touchstone of waiver doctrine is intent—the state's litigation conduct must clearly indicate the state's intent to waive its immunity." (citation omitted)); *Ku*, 332 F.3d at 434 (quotation marks and citation omitted).

---

its immunity from suit on those claims in federal court by voluntarily removing the case to federal court. *Id.*

[17] As noted, *Lapides* ultimately held that voluntary removal was a clear litigation act amounting to waiver. *Lapides*, 535 U.S. at 624*.

Although *Lapides* holds that a state's voluntary removal to federal court of a state-law claim for which it has waived immunity in state court amounts to a waiver of sovereign immunity for that claim, 535 U.S. at 616, *Lapides* does not confine litigation-conduct waiver to the act of removal. In fact, Justice Kennedy has long advocated for "a rule inferring waiver [of sovereign immunity] from the failure to raise the objection at the outset of the proceedings." *Schacht*, 524 U.S. at 395 (Kennedy, J., concurring). Such a clear rule, he suggests, would eliminate the unfairness that results whenever a state is allowed to "test the waters" of a plaintiff's claim before deciding whether to assert immunity against those claims or defend them on the merits. *Id.* at 394–95. Although neither the Supreme Court nor the Sixth Circuit has yet adopted such a strict waiver rule, the Sixth Circuit has recognized that the failure to raise an affirmative defense—even immunity—in a responsive pleading subjects a defendant to the *possibility* of finding waiver. *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 750–51 (6th Cir. 2015) (district court did not abuse discretion in finding waiver when qualified immunity was not raised in responsive pleading or at all until after close of discovery); Fed. R. Civ. P. 8(c). Moreover, the Sixth Circuit has applied *Lapides*' reasoning and found waiver by litigation conduct even in instances where the state was made an involuntary defendant in a suit originally filed in federal court, where the state nonetheless defended the suit on the merits. *E.g.*, *Ku*, 322 F.3d 431 (state waived sovereign immunity by engaging in discovery, moving for

summary judgment on the merits, and waiting to raise the defense until after receiving an unfavorable decision on the summary judgment motion).

On the other hand, sovereign immunity is not *necessarily* waived simply by failing to raise it in the state's responsive pleading. *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 682–83 (6th Cir. 2018) ("Although a state agency may waive its sovereign immunity and consent to suit by voluntarily appearing and defending against the merits of a case in federal court, we have not required an agency to make a full-throated assertion of its immunity in its initial dealings with the court to avoid waiver." (citing *Boler v. Earley*, 865 F.3d 391, 410–11 (6th Cir. 2017))); *Ku*, 322 F.3d at 434 (noting *Lapides* "did not go so far as either to accept or reject [Justice Kennedy's] broader suggestion to treat Eleventh Amendment immunity defense as one, like the defense of lack of personal jurisdiction, that can be permanently waived when a State fails to raise the objection at the outset of proceedings"); *cf. Raygor*, 534 U.S. at 547 (acknowledging the Supreme Court has not adopted a standard of waiver through "failure to raise the objection at the outset of the proceedings" (quoting *Schacht*, 524 U.S. at 395 (Kennedy, J., concurring))). In fact, the Sixth Circuit has found that a state did not waive sovereign immunity by arguing against a motion for preliminary injunction on the merits but then raising the immunity defense in a supplemental brief regarding jurisdiction, where the state had not otherwise engaged in discovery. *Boler*, 865 F.3d at 411; *see also Barachkov*, 580 F. App'x at 300 (no waiver even though entity raised defense primarily in

reply to motion for summary judgment where defense was also raised first in Answer and Affirmative Defenses and belated assertion did not appear to be a tactical choice). Ultimately, whether a state has waived its sovereign immunity by voluntarily participating in the federal litigation is a highly fact-intensive question and depends on the individualized circumstances of the case.

Here, the State Board Defendants have been aware of Plaintiffs' state-law claims since November 2019, Compl., ECF No. 1, ten months before they asserted an immunity defense. The State Board Defendants briefed, at the Court's request, the standing and ripeness of this case and moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction on those grounds. Brief, ECF No. 22. But the State Board Defendants did not move at that time to dismiss on the additional basis of sovereign immunity; nor did they even suggest that they would raise that defense later in the proceeding. *See id*.

The State Board Defendants next failed to assert a sovereign immunity defense even after another defendant invoked it. After the Court found that Plaintiffs had standing and that their claims were ripe, the Court invited the parties to submit a joint briefing schedule pertaining to Plaintiffs' then-pending motion for a preliminary injunction. Order, ECF No. 26. In response, Governor DeWine moved to dismiss all claims against him arguing, *inter alia*, that the state-law claims against *him* were barred by sovereign immunity. Mot. Dismiss, ECF No. 29. Notably, counsel for Governor DeWine also represents the State Board Defendants, but no such motion for dismissal of the state-law claims was filed on

their behalf. And Governor DeWine's motion specifically sought dismissal of the state-law claims on sovereign immunity grounds *only* against Governor DeWine; it contained no hint that a similar defense would be raised in a later filing by the State Board Defendants. *See id.* at 9 (citing *Pennhurst* and arguing that "the Court lacks jurisdiction to hear Plaintiffs' Ohio constitutional claims *brought against Governor DeWine*. Those claims, like Plaintiffs' federal constitutional and statutory claims, should therefore be dismissed *as to Governor DeWine*." (emphasis added)). Instead, the State Board Defendants signed off on a joint proposed scheduling order in which they agreed to participate in discovery by certain deadlines, brief Plaintiffs' motion for a preliminary injunction, and defend the Fast-Track Transfer Statute at a preliminary injunction hearing. Proposed Joint Sch. Order, ECF No. 30. The conscious choice by the same counsel to assert a sovereign immunity defense for Governor DeWine but not the State Board Defendants was certainly a clear indication to the Court and Plaintiffs that the State Board Defendants would not raise that defense, especially where that same counsel agreed to a scheduling order pertaining to discovery and merits briefing on the preliminary injunction.

The State Board Defendants thereafter filed an Answer but again did not raise a sovereign immunity defense. Answer, ECF No. 33. Instead, the only affirmative defense raised was that Plaintiffs' Amended Complaint failed to state a claim. *Id*.

The parties then filed a joint Rule 26(f) report in which the State Board Defendants failed to mention a sovereign immunity defense. ECF No. 36. Indeed, that report specifically asked if there were "any contested issues related to venue or jurisdiction." *Id.* at 2. But in response to that question, the parties noted only that Hills and Dales contested the Court's jurisdiction over Count Six of Plaintiffs' Amended Complaint. *Id.* No mention of sovereign immunity was made by the State Board Defendants in the Rule 26(f) report, and the State Board Defendants did not challenge the Court's jurisdiction over Plaintiff's state-law claims. *See generally, id.*

Moreover, the Rule 26(f) report established a deadline of March 13, 2020, for the filing of any venue- or jurisdiction-related motions. *Id.*; Preliminary Pretrial Order, ECF No. 37. The State Board Defendants failed to move for dismissal based on lack of jurisdiction due to sovereign immunity by that date. The parties should have been aware since *Ku* that, in the Sixth Circuit, sovereign immunity is more akin to personal jurisdiction (which can be waived) than subject-matter jurisdiction (which cannot). Therefore, it is not unreasonable to expect the State Board Defendants to abide by the deadline established for asserting such jurisdictional arguments. Thus, by permitting a deadline expressly established for jurisdictional arguments to lapse without raising the sovereign immunity issue, the State Board Defendants again clearly expressed their intent to defend the state-law claims in this case on the merits.

Plaintiffs then moved for a temporary restraining order ("TRO"), Mot. TRO, ECF No. 39, and the parties voluntarily agreed to drop Governor DeWine as a party. Mot., ECF No. 42; Order, ECF No. 43. The State Board Defendants subsequently argued the merits of the state-law claims in their response to Plaintiffs' motion for a TRO, failing to raise sovereign immunity as an alternative defense. Am. Resp. 14, ECF No. 46. Moreover, all parties appeared for the hearing on Plaintiff's motion for a TRO. At that time, after making their opening statements, all parties agreed to suspend the TRO hearing and to engage in discovery and resolve the Amended Complaint through a combined preliminary and permanent injunction hearing. Agreed Order, ECF No. 63; TRO Hrg. Tr. at 6:10–12, ECF No. 64 (contemplating the State Board Defendants' participation in "extensive discovery" before the combined preliminary/permanent injunction hearing). Counsel for the State Board Defendants specifically stated at that hearing that the State Board Defendants asked counsel to "defend what the constitutionality of the law is," and he briefly argued the merits of the state-law claims, further suggesting the State Board Defendants intended to defend the suit on the merits at the future combined preliminary and permanent injunction hearing. TRO Hrg. Tr. at 10:19–21, ECF No. 64. The Agreed Order specifically contemplated a decision "*on the merits*". Agreed Order, ECF No. 63 (emphasis added).

Thereafter, and to that end, the State Board Defendants engaged in discovery, including participating in informal discovery conferences with the

Court.  The Court ruled on several discovery matters through informal conferences, but at no time during the discovery period did the State Board Defendants raise the issue of sovereign immunity—in connection with a discovery dispute or otherwise.  The State Board Defendants participated in months of fact and expert discovery without ever raising the issue of sovereign immunity.

Due to the impact of COVID-19 on the Court's ability to hold an in-person hearing, all parties, including the State Board Defendants, ultimately agreed to submit the case for a merits decision by way of briefs in lieu of a hearing.  Order, ECF No. 101; Conference Hrg., ECF No. 102.  Again, the State Board Defendants made no mention of an immunity defense during that teleconference with the parties.

In fact, the only reason the Court ordered Plaintiffs to address the *Pennhurst* issue at all is because it *was* raised prior to the close of discovery, and the Court believed it was therefore required to address it.  But a closer examination of the docket reveals that it was raised by *non-party movants* State Representative Scott Oelslager, State Representative Thomas Brinkman, State Senator Kirk Schuring, and State Legislative Aides Michaela George and Alexandra Harris, Mot. Quash 12 n.1, ECF No. 79, not by the State Board Defendants.  Critically, even then—after several non-parties had explicitly raised the issue in April 2020—the State Board Defendants *still* took no action on their

own behalf indicating they intended to raise sovereign immunity as a defense until after the issue was raised by the Court.

The Court does not find waiver lightly. Nonetheless, having reviewed the above litigation conduct in this case, the Court finds the State Board Defendants have manifested a clear intent to defend the state-law claims on the merits and not raise an immunity defense.

In so finding, the Court notes that this case is unlike *Boler* and *Brent*, two cases which, at first blush, seem to support the State Board Defendants' waiver argument. Because the litigation conduct of the state defendants in *Boler* and *Brent* is dissimilar to the conduct by the State Board Defendants here, the court discusses those cases in some detail in order to highlight the differences.

In *Boler*, the plaintiffs moved for a preliminary injunction against a city defendant before any of the defendants responded to the Complaint, and responses to that motion were due before responses to the Complaint were due. Mot. Prelim. Inj., ECF No. 17, Case No. 5:16-cv-10323 (E.D. Mich.); *id.* at ECF No. 18 (establishing deadline for responding to motion for preliminary injunction by March 9, 2016); *id.* at ECF No. 27 (establishing deadline for responding to Complaint by April 8, 2016). The state defendants responded to the merits of the preliminary injunction motion without raising a sovereign immunity defense. *Id.* at ECF No. 29. But, before the district court ruled on that motion, and before responses to the plaintiffs' Complaint were even due, the court held a status conference and asked the parties to submit jurisdictional arguments. *See* Supp.

Brief, ECF No. 41, Case No. 5:16-cv-10323. The state defendants raised the sovereign immunity defense in the supplemental brief filed in response to that request, explaining that they had not raised the issue in their initial response to the plaintiffs' motion for a preliminary injunction only "because that motion was solely against the City of Flint and did not implicate the Court's jurisdiction as to State Defendants." *Id*. at 1. They explained that they "had anticipated including these jurisdictional arguments in their motion to dismiss . . . which by stipulation [wa]s due on April 8, 2016." *Id*.

Thus, in *Boler*, the sovereign immunity defense was raised in the state defendants' second substantive filing with the court, which was filed less than two months after the plaintiffs' Complaint was filed. And the only reason it was not raised earlier was because the state defendants thought it was more appropriate to raise the defense in their motion to dismiss the Complaint than the response to the plaintiffs' preliminary injunction motion, which was directed at a different defendant.

The district court thereafter dismissed the entire complaint for lack of subject-matter jurisdiction. Order, ECF No. 56, Case No. 5:16-cv-10323. That dismissal occurred less than three months after the Complaint was filed and before any discovery occurred. The district court's decision rested on a finding that the plaintiffs' § 1983 claims were precluded by the Safe Drinking Water Act, and the court did not address sovereign immunity. *See id.*

On appeal, the Sixth Circuit reversed the district court's dismissal and then considered immunity as an alternate basis for affirming in part the district court's dismissal of claims against the state defendants.  As to the immunity defense, the Sixth Circuit rejected the plaintiffs' arguments that the state consented to suit by engaging in settlement discussions and passing legislation that might have an ancillary effect on the litigation.  *Boler*, 865 F.3d at 410–11.  The Sixth Circuit found that the state defendants did not waive the defense by failing to assert it in their initial response to plaintiffs' motion for a preliminary injunction or the joint statement of resolved and unresolved issues and instead including it for the first time in the supplemental brief.  *Id.*

The Sixth Circuit's waiver holding in *Boler* is unsurprising given that: (1) the joint statement of resolved and unresolved issues in *Boler* was directed to a *different* defendant, and there would have therefore been no reason for the state defendants to assert immunity in that filing, *see* Order, ECF No. 30, Case No. 5:16-cv-10323; (2) the state defendants had adequately explained why they did not feel the immunity defense was relevant to their initial response to the preliminary injunction motion; (3) the state defendants did not engage in any discovery prior to asserting the immunity defense, and (4) they raised the issue at an early juncture in the litigation—less than two months after the Complaint was filed.

*Brent* is also distinguishable.  *Brent* involved a lawsuit against, *inter alios*, both the Michigan Department of Human Services and the Wayne County

Department of Human Services. Both of those entities raised a sovereign
immunity defense in their first response to the plaintiff's Complaint (which the
Sixth Circuit referred to on appeal as a motion for summary judgment because it
was styled as a joint motion to dismiss and/or for summary judgment). *See* Mot.
Dismiss and/or for Summ. J., ECF No. 50, Case No. 5:11-cv-10724 (E.D. Mich.).
The district court granted in part and denied in part that motion. ECF No. 113,
Case No. 5:11-cv-10724. Plaintiff then filed an Amended Complaint. ECF No.
114, Case No. 5:11-cv-10724. Again, both the state entity and the county entity
raised a sovereign immunity defense in their first response to the Amended
Complaint. *See* Mot. Dismiss and/or for Summ J., ECF No. 120, Case No. 5:11-
cv-10724. Again, the district court granted in part and denied in part that motion,
granting dismissal on the basis of sovereign immunity to the Michigan
Department of Human Services but denying dismissal on the basis of sovereign
immunity to the county agency after finding it was not an arm of the State of
Michigan. ECF No. 163, Case No. 5:11-cv-10724. That agency immediately
moved for reconsideration, arguing it was an arm of the State of Michigan. Mot.
Reconsider, ECF No. 164, Case No. 5:11-cv-10724. The district court granted
the motion for reconsideration. Order, ECF No. 171, Case No. 5:11-cv-10724.

On appeal, the plaintiffs[18] argued that the county department waived its
sovereign immunity defense by not sufficiently briefing the specific argument that

---

[18] The Amended Complaint had added an additional plaintiff.

it was an arm of the State in its initial combined motion to dismiss/for summary judgment and, instead, fleshing it out fully only on the motion for reconsideration. *See Brent*, 901 F.3d at 682. The Sixth Circuit's *Brent* decision held merely that the county entity did not waive sovereign immunity by failing to fully develop the argument that it was an arm of the State in its combined motion to dismiss/motion for summary judgment when it nonetheless "undeniably invoked its sovereign immunity in [that] initial motion[.]" *Id.* at 683.[19]

Here, this Court does not find waiver based merely on the State Board Defendants' merits defense to Plaintiffs' TRO motion. Nor does the Court find that the State Board Defendants failed to fully develop their argument in their summary judgment motion and therefore waived it—either of which would be precluded by *Boler* and *Brent*. Rather, the Court finds, as explained both above and below, that the State Board Defendants' pre-summary-judgment litigation conduct manifested a clear intent to waive the defense and was inconsistent with

---

[19] Other cases in which the Sixth Circuit failed to find waiver are also distinguishable. *See e.g.*, *Barachkov*, 580 F. App'x at 300 (unlike the State Board Defendants in this case, the state entity raised sovereign immunity in its Answer and Affirmative Defenses, before briefing it most fully in its summary judgment reply brief); *Akers v. Cty. of Bell*, No. 10-5513, 2012 WL 3518561 (6th Cir. 2012) (defendant asserted sovereign immunity in Answer; subsequent assertion of a non-merits-based (statute of limitations) defense to state-law claim at summary judgment did not amount to waiver by litigation conduct); *Akers v. Cty. of Bell*, Answer, ECF No. 9, 6:08-cv-389 (E.D. Ky.) (asserting sovereign immunity defense). Nor does the Sixth Circuit's recent sovereign immunity case, *Ladd v. Marchbanks*, 19-4136, 2020 WL 4882885 (6th Cir. Aug. 20, 2020), undermine this Court's conclusion. That case expressly acknowledges waiver and states that the defendant "asserted [the state's] sovereign immunity in a motion to dismiss before taking any other action that can be construed as consenting to this suit." *Id.* at *3 n.3.

its subsequent assertion of the defense essentially on the eve of "trial"[20].  That litigation conduct precludes them from asserting sovereign immunity at this final stage of litigation.

The Court also notes that dicta in some Sixth Circuit opinions suggest that waiver will be found only when a state entity asserts the defense after a district court has ruled on the merits of a claim.  However, this Court has found no Sixth Circuit opinion establishing such a bright-line rule, nor would such a rule be advisable.  The dangers highlighted by Justice Kennedy in his *Schacht* concurrence are just as present if a state entity is permitted to assert the defense on the last day of trial, for example, rather than after the jury returns its adverse verdict.  The point of waiver by litigation conduct is to prevent the entity from agreeing to permit a court to render a decision on the merits—so long as it feels it will win on the merits—and then belatedly changing course and asserting sovereign immunity as a tactical decision when it begins to feel the tide of litigation changing against it.  Whether that belated assertion is made after the adverse ruling actually comes down or before should make no difference to the waiver analysis.  That is especially true in instances, like here, where the defense is first asserted after the entity is able to see the strength of the plaintiffs' claim on the merits, when the plaintiffs' trial brief has been submitted, and the only

---

[20] Again, it was clear from the teleconference that all parties anticipated a final merits ruling based on the submission of the summary judgment briefs, regardless of whether the Court would have needed to resolve issues of fact.

remaining step is for the Court to actually issue its ruling on that claim. In sum, the Court finds the fact that the State Board Defendants asserted sovereign immunity before the Court issued its dispositive ruling as one factor to be considered—but ultimately inconclusive in and of itself—to the waiver analysis.

The State Board Defendants' litigation conduct here is akin to the conduct in *Hunter v. Hamilton Cty. Bd. of Elections*, 850 F. Supp. 2d 795, 802 (S.D. Ohio 2012), where the Court also found waiver. *See also Hill v. Blind Indus. and Servs. of Maryland*, 179 F. 3d 754 (9th Cir. 1999) (finding waiver where entity litigated the action on the merits until raising sovereign immunity on the first day of trial); *Horton v. 48th Dist. Ct.*, No. 2:05-cv-72356, 2006 WL 3386588 (E.D. Mich. Nov. 21, 2008) (sovereign immunity deemed waived where entity failed to plead it in Answer and Affirmative Defenses, engaged in discovery, and asserted the defense on the eve of trial, only after the court *sua sponte* raised the issue).

Further, the time-sensitive nature of this case, in combination with the litigation history, supports a finding of waiver. All parties were aware of the time-sensitive nature of this case from the moment the first lawsuit was filed. Compl., ECF No. 1, Case No. 2:19-cv-4246. That Hills and Dales has been attempting to transfer to Jackson Local School District for the 2020–2021 school year has been known from the outset, and the parties and Court had initially endeavored to have a final ruling on this case before or near the beginning of the school year. *See* Order, ECF No. 63. And yet, even knowing that the Court would rule as close to mid-August as possible, by July 16, 2020, the State Board Defendants

had still failed to raise the sovereign immunity issue. Given this knowledge, the decision to not raise the sovereign immunity defense earlier in the litigation could be viewed as a tactical decision.[21] But a dismissal at this late stage would likely prevent Plaintiffs from obtaining meaningful relief on any meritorious state-law claim (absent a finding in Plaintiffs' favor on the federal claims) given that the transfer is poised for completion. This is all the more true given that the tolling provision in 28 U.S.C. § 1367 may not apply to any claims re-filed in state court. *See Raygor v. Regents of Univ. of Minnesota*, 534 U.S. 533, 536 (2002) ("the tolling provision does not apply to claims filed in federal court against nonconsenting States"). It would be wholly unfair for the State Board Defendants to litigate as if they consented to this Court rendering a decision on the merits of the state-law claims, permit the statute of limitations to continue running, and then assert immunity at the last moment when Plaintiffs would have little to no time to seek and obtain relief in state court before any transfer would be effectuated upon the Court's resolution of the federal claims.[22] *See Barachkov*, 580 F. App'x at 299 ("A clear intent to waive immunity may be inferred when a state's litigation conduct is inconsistent and unfair. Waiver doctrine prevents the

---

[21] To be fair, the Court asked Plaintiffs to brief the issue given its mistaken belief that the State Board Defendants (rather than non-party movants) had already attempted to belatedly assert the defense. The State Board Defendants may have viewed the Court's Order to Plaintiffs as an invitation to raise the immunity defense for the first time in its summary judgment motion. The Court's Order was not intended as such an invitation.

[22] Again, assuming the Court did not rule in Plaintiffs' favor on the remaining federal claims.

state from gaining an unfair litigation advantage by prohibiting a state from testing the waters with respect to the merits of its claim only to assert sovereign immunity once it believes its claim will fail. That is, a state waives its sovereign immunity where its dilatory assertion of immunity is a 'tactical decision.'" (citations omitted)).

Accordingly, both the State Board Defendants' litigation conduct and the time-sensitive nature of the case lead the Court to find that the State Board Defendants have waived their sovereign immunity as it relates to having Plaintiffs' state-law claims decided in federal court.

## B. Supplemental Jurisdiction

Still, that the Court has concluded the State Board Defendants waived sovereign immunity by their litigation conduct and consented to a decision of the state-law claims on the merits does not necessarily mean the Court should exercise its supplemental jurisdiction over those state-law claims.

The Supreme Court has cautioned that "a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988). These principles therefore demand the Court be mindful and purposeful in its exercise of supplemental jurisdiction over state-law claims. Accordingly, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise

jurisdiction over a case brought in that court involving pendent state-law claims." *Id.* at 350. At bottom, it is a "doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Id.*

On the one hand, principles of comity and federalism are more important where, like here, a plaintiff challenges the actions of a state actor under state law. The Supreme Court has stated that, "[w]here . . . the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and the State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976).

On the other hand, *Rizzo* involved a plaintiff requesting that the federal court exercise its equitable power to fashion specific procedures for a state agency to follow as a remedy. *Id.* Here, Plaintiffs seek to sever and invalidate an unconstitutional statute, a straightforward form of relief that would be equally available if the Court considered and determined that Plaintiffs prevailed on the merits of their federal claims and which imposes no like intrusion on a state official's discretionary authority to perform his official functions. Moreover, Plaintiffs' Amended Complaint primarily asserted federal claims, so it cannot be contended that state-law issues predominated over the federal ones (either in allegations or in proof).

And notwithstanding any caution in *Rizzo*, the Supreme Court reiterated in *Pennhurst* that "[n]othing in [its] decision [was] meant to cast doubt on the desirability of applying the *Siler* principle in cases where the federal court has jurisdiction to decide state-law issues." *Pennhurst*, 465 U.S. at 118 n.28; *see also* Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 197-98 (Oxford Press 2018) ("[There are] many good reasons to answer the state constitutional question before the federal one in a dual-claim case. Nothing prevents federal courts from doing just that in their own cases by resolving the state claim first . . . .").

Given that the Court has determined that it has jurisdiction to decide the state-law issues because the State Board Defendants waived their sovereign immunity defense, the Court finds the *Siler* principle applies here. The analysis of Plaintiffs' state-law one-subject rule claim is straightforward, this Court is intimately familiar with the facts of this case and with the Fast-Track Transfer Statute, and an imminent merits decision is of the essence because all parties deserve to know, as soon as possible, whether Hills and Dales residents will attend Plain Local or Jackson Local schools for the 2020–2021 school year.

Further, for all intents and purposes, litigation has proceeded to the trial phase in this Court, and judicial efficiency is served by considering the state-law claim. The alternatives—dismissal without prejudice or certifying a question to the state Supreme Court—would cause delay and judicial inefficiency. This is especially true here because the Supreme Court of Ohio has already offered on-

point guidance on the one-subject rule requirement and would therefore likely not accept a certified question.

Additionally, the analysis of Plaintiffs' federal claims is much more convoluted and uncertain[23] and, therefore, resolution of those claims first would result in increased judicial resources as well as delay in publishing a ruling.

Therefore, out of judicial efficiency and economy, convenience, and fairness to the parties, it is more sensible for this Court to decide the state-law claim than to dismiss those claims, force the parties to begin at square one in state court, and engage in the more challenging analysis of the federal claims. This is more apparent given the Court's conclusion that Plaintiffs prevail on the one-subject rule claim—it would make little sense to analyze the myriad remaining, more complex federal claims, upon which Plaintiffs may or may not prevail, when their state-law claim is plainly meritorious and warrants the relief sought. Accordingly, the Court turns to its analysis of Plaintiffs' one-subject rule claim.

## C. State Constitutional Claims

Counts VI and VII of Plaintiffs' Amended Complaint assert claims under the Ohio Constitution. Am. Compl. ¶¶ 149–56, ECF No. 18. Specifically, Plaintiffs allege Defendants have violated the "One-Subject Provision" and the "Three-

---

[23] This is not to say that Plaintiffs' federal claims were merely colorable or were fraudulently asserted in order to give this Court jurisdiction over the state-law claims. *See Siler*, 213 U.S. at 191–92 (citation omitted).

Reading Rule," Sections 15(D) and 15(C) of Article II of the Ohio Constitution, respectively. *Id*. Because Plaintiffs' argument as to the one-subject rule prevails, the Court's analysis begins and ends with that claim.

### 1. One-Subject Rule Overview (Ohio Const. Art. II §15(D))

Plaintiffs challenge the Fast-Track Transfer Statute as violating Section 15(d), Article II of the Ohio Constitution. The Court pauses before proceeding to acknowledge three important principles. First, statutes have a strong presumption of constitutionality, and the "party challenging the constitutionality of a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt." *State ex rel. Dix v. Celeste*, 11 Ohio St. 3d 141, 142; *Cleveland v. State*, 989 N.E.2d 1072, 1078 (Ohio Ct. App. 2013) (citations omitted). Second, as a general matter, a court should not second-guess the wisdom of the legislature's policy decisions. *Groch v. Gen. Motors Corp.*, 117 Ohio St. 3d 192, 230 (2008). Third, "[t]o avoid interfering with the legislative process," the Court must afford "great latitude" to the Ohio General Assembly "by not construing the one-subject provision so as to unnecessarily restrict the scope and operation of laws, or to multiply their number excessively, or to prevent legislation from embracing in one act all matters properly connected with one general subject." *State ex rel. Ohio Civ. Serv. Emps. Ass'n v. State Emp. Relations Bd.*, 104 Ohio St. 3d 122, 129–30 (2004) (quoting *Dix*, 11 Ohio St. 3d at 145). This does not, however, mean the Court must give total deference to the General Assembly when it comes to one-subject rule analyses. *Simmons-Harris*

*v. Goff*, 86 Ohio St. 3d 1, 15 (1999). "The one-subject rule is part of [Ohio's] Constitution and therefore must be enforced." *Id.* With these principles in mind, the Court analyzes Plaintiffs' claim.

Section 15(d), Article II of the Ohio Constitution reads, in pertinent part, "[n]o bill shall contain more than one subject, which shall be clearly expressed in its title." This provision is often referred to colloquially as the "one-subject rule" or "single-subject rule."

The one-subject rule was enacted in order to prevent logrolling and riders, and, although once viewed largely as toothless and merely directory in nature, the Supreme Court of Ohio has reiterated the importance of enforcing the constitutional provision. *Simmons-Harris*, 86 Ohio St. 3d at 14–15; *In re Nowak*, 104 Ohio St. 3d 466, 477 (2004) ("Since the one-subject provision is capable of invalidating an enactment, it cannot be considered merely directory in nature."). In fact, the Supreme Court of Ohio has instructed that, typically, a court should hold invalid any act that violates the one-subject rule. *Id.* at 14.

A threshold question for the Court's consideration is whether appropriations bills, which often contain myriad provisions touching on a multitude of different subject matters, are, by that nature, exempt from one-subject rule challenges. The answer is a flat "no." To be sure, the Supreme Court of Ohio recognized that appropriations bills "are different from other Acts of the General Assembly" precisely because they necessarily "encompass many items[.]" *Id.* at 15. But even appropriations bills must abide by the one-subject

rule in the sense that all items encompassed in the bill must be "bound by the thread of appropriations." *Id.* at 16.

Indeed, because of the inherent temptation to tack riders[24] onto large appropriations bills, some have argued appropriations bills warrant *more* scrutiny for non-appropriations riders than other bills. *City of Dublin v. State*, 769 N.E. 2d 436, 447–48 (2002) (citing "a need for caution when considering the appropriateness of including . . . non-appropriation riders in an appropriations bill"); Daniel A. Farber & Philip P. Frickey, The Jurisprudence of Public Choice, 65 Tex. L. Rev. 873, 923 (1987) (enforcement of a one-subject rule "is particularly appropriate when substantive riders have been attached to appropriations legislation"). In *Simmons-Harris*, the Supreme Court of Ohio similarly recognized appropriations bills' inherent susceptibility to unconstitutional riders when it struck one such rider as violating the one-subject rule. *Simmons-Harris*, 86 Ohio St. 3d at 16 ("The danger of riders is particularly evident when a bill as important and likely of passage as an appropriations bill is at issue.").

Given this temptation to incorporate riders into a must-pass budget bill, it is not surprising that Ohio courts have found with some frequency that provisions in appropriations bills violated the one-subject rule. *See, e.g., Simmons-Harris*, 86 Ohio St. 3d at 17; *State ex rel. Ohio Civ. Serv. Emps. Ass'n*, 104 Ohio St. 3d at

---

[24] "Riders are provisions that are included in a bill that is so certain of adoption that the rider will secure adoption not on its own merits, but on [the merits of] the measure to which it is attached." *Simmons-Harris*, 86 Ohio St. 3d at 16 (internal quotation marks and citation omitted).

131 (striking rider to appropriations bill where there was no evidence "whatever as to the manner in which the amendment . . . [would] clarify or alter the appropriation of state funds"); *Cleveland*, 989 N.E.2d at 1085–86; *Rumpke Sanitary Landfill, Inc. v. State*, 919 N.E.2d 826, 832 (Ohio Ct. App. 2009) (rejecting argument that amendments did not violate the one-subject rule because they would affect a $120 million appropriation and finding instead there was no evidence of what impact the added provisions would have on state's biennial budget); *In re Holzer Consol. Health Sys.*, No. 03AP-1020, 2004 WL 2341322, *8 (Ohio Ct. App. Oct. 19, 2004) (provision added to appropriations bill to further the interest of a specific group violated one-subject rule because it bore "no relation to the utilization of government resources or how budgetary funds are to be distributed" and because it "was inserted into the bill late in the process and for what appear[ed] to be tactical reasons"); *City of Dublin*, 769 N.E.2d at 452–53 (2002) (finding no connection between a state budget and a statute preventing municipal governments from generating certain revenues from utility companies using state routes within the municipality).

On the other hand, a provision will not be stricken from an appropriations bill under the one-subject rule if it "relates to funding the operations of programs, agencies, and matters described elsewhere in the [appropriations] bill." *See Comtech Sys., Inc. v. Limbach*, 59 Ohio St. 3d 96, 99 (1991) (provision enacting new sales tax that would fund other operations contained in the appropriations bill was acceptable in appropriations bill); *State ex rel Ohio Civ. Serv. Emps.*

*Ass'n v. State*, 146 Ohio St. 3d 315, 322 (2016) (finding the challenged provisions "relate[d] directly to the funding of continued operation of state programs," as well as revenue generation, and thus did not violate the one-subject rule); *Cuyahoga Cty. Veterans Servs. Comm'n v. State*, 823 N.E.2d 888, 892 (Ohio Ct. App. 2004) (amendments dealing with membership to veterans service commission and submission of operating budget to board of county commissioners properly included in appropriations bill because "[t]he subject of funding and budgeting by agencies and political subdivisions is implicated throughout the [appropriations] bill" and "[c]ounty budgeting processes are necessarily affected by overall state appropriations even when a specific section of a bill relates only to budgeting of local government funds");[25] *Riverside v. State*, 944 N.E.2d 281, 298–300 (Ohio Ct. App. 2010) (provision affecting city's ability to collect certain income taxes related to state budget because it had a "direct effect on the state's funding for the city" by impacting how much money the city would receive from the state through the Local Government Fund).

Having determined that the appropriations bill at issue here, House Bill 166, must comply with the one-subject rule in order to be constitutional, the next

---

[25] This reasoning—that because other provisions of the appropriations bill implicate county funding by the state and because the challenged amendment implicates county funding, the amendment relates to the state budget—would essentially eviscerate the one-subject rule in the appropriations context and is at odds with *State ex rel. Ohio Civ. Serv. Emps. Ass'n*, which was decided after this case. 104 Ohio St. 3d at 130 (rejecting idea that any amendment that slightly impacts the state budget can be included in an appropriations bill merely because other provisions in the bill also impact the state budget as stretching the one-subject rule to the point of rendering it "meaningless" in the appropriations context).

question is whether the inclusion of the Fast-Track Transfer Statute within the appropriations bill violates that rule.

Ultimately, the Court looks to the relationship between the challenged provision in the appropriations bill and the overarching purpose of the appropriations bill. The Fast-Track Transfer Statute will be deemed to violate the rule if it and the budget bill lack a common purpose or relationship so that there is "no discernible practical, rational or legitimate reason[]" for including the Fast-Track Transfer Statute in the budget. *Simmons-Harris*, 86 Ohio St. 3d at 14. "[T]he one-subject provision is not directed at plurality but at disunity in subject matter." *State ex rel. Ohio Civ. Serv. Emps. Ass'n*, 104 Ohio St. 3d at 130; *see also Cleveland*, 989 N.E.2d at 1084 ("It is the disunity of subject matter, rather than the aggregation of topics, that cause a bill to violate the one-subject rule." (citation omitted)). Where there is such disunity, "there is a strong suggestion that the provisions were combined for tactical reasons, *i.e.*, logrolling," the "very evil the one-subject rule was designed to prevent." *Dix*, 11 Ohio St. 3d at 145; *see also id.* at 143 ("The rule prevents extraneous matters from being introduced into consideration of the bill by disallowing amendments not germane to the subject under consideration.").

### 2. Analysis of Plaintiffs' One-Subject Rule Claim

Following the above law, the Court finds, for the reasons discussed *infra*, that the Fast-Track Transfer Statute, a significant, substantive, and controversial amendment to House Bill 166, is a mere rider that was tactically inserted into the

must-pass budget bill in order to secure its passage.  It has no discernible practical, rational, or legitimate relationship to the state budget, and, therefore, its inclusion in the same violates the one-subject rule.

> a.  *Simmons-Harris*

The seminal decision regarding one-subject rule analyses and appropriations bills is *Simmons-Harris*, and the Supreme Court of Ohio in that case struck the education-related rider as violative of the one-subject rule.  The connection in this case between the Fast-Track Transfer Statute and the state budget is even more tenuous than was the connection at issue in *Simmons-Harris*.  Because the Supreme Court of Ohio's analysis in *Simmons-Harris* is important and establishes the factors to be considered, the Court discusses that case in some detail.

As here, *Simmons-Harris* involved multiple challenges to an appropriations bill, one of which was brought under the one-subject rule.  Specifically, the plaintiff argued that the provision in the budget bill creating the School Voucher Program violated the one-subject rule because the School Voucher Program was insufficiently linked to the general purpose of appropriations, and the Supreme Court of Ohio agreed.  *Simmons-Harris*, 86 Ohio St. 3d at 16.  Notably, the Supreme Court found the School Voucher Program's inclusion in the appropriations bill violated the one-subject rule *even though* the School Voucher Program provided that the State of Ohio would directly send to students and parents funds to expend on education and, therefore, directly impacted the state

budget. *Id.* at 16–17. In finding that this direct impact on the state budget did not ameliorate the disunity between the budget bill and the school voucher statutes, the Supreme Court of Ohio considered that: (1) the School Voucher Program was a "significant, substantive program" yet comprised only ten pages of the 1,000+ page appropriations bill; (2) the School Voucher Program itself was "inherently controversial and of significant constitutional importance" such that it warranted discussion and debate; and (3) there was "blatant disunity between" the School Voucher Program and the rest of the appropriations bill so that the addition of the program appeared "tactical." *Id.* at 16–17. In short, the Supreme Court of Ohio concluded from those facts that the School Voucher Program "was in essence little more than a rider attached to an appropriations bill." *Id.* at 16, 17. Considering those same factors, this Court reaches the same conclusion regarding the Fast-Track Transfer Statute.

### b. Significant and Substantive

First, like the School Voucher Program at issue in *Simmons-Harris*, the Fast-Track Transfer Statute is both substantive and significant, yet it consists of a mere two pages tucked within a 2,600-page budget bill. *See* Am. Sub. H.B. 166, 133d Gen. Assemb. (Ohio 2019).

Although it does not create a new program like the statute did in *Simmons-Harris*, the Fast-Track Transfer Statute is substantive in the sense that it creates an entirely new manner for effectuating certain school district transfers. At its core, the Fast-Track Transfer Statute is a school choice provision. It enables

parents in certain townships to choose which school district they are part of, send their children to, and pay taxes to. And although the statute establishes the *procedure* for effectuating a transfer, it has a *substantive* impact on the makeup of various school districts around the state by changing school district boundary lines. Even the State Board Defendants characterize the statute as furthering "important substantive concerns of the Ohio Legislature." Resp. 10, ECF No. 135. The statute's effect is therefore sufficiently substantial to warrant specific consideration by the legislature prior to passage.

Moreover, the statute is certainly significant to the persons affected by it. The question of significance is qualitative, not quantitative. *See Simmons-Harris*, 86 Ohio St. 3d at 12, 16 (finding the School Voucher Program, which at the time of consideration affected only *one* school district, was sufficiently significant to violate one-subject rule); *State ex rel. Ohio Civ. Serv. Emps. Ass'n*, 104 Ohio St. 3d at 132 (rejecting idea that only leading-edge legislation deserves separate discussion in the General Assembly and "declin[ing] to adopt a rule that requires a correlation between the degree of legislative attention given to a statutory provision within a proposed bill and the number of people affected by it").

Transfers under this statute are not subject to any state oversight or any of the procedural safeguards enacted to ensure transfers are fair and do not negatively impact a portion of the Ohio public-school student body. Moreover, because the only people who vote on the transfer are those who reside in the territory (which is not defined) seeking the transfer, transfer petitions are

essentially guaranteed to pass.[26]  This  evasion of state oversight and new placement of transfer power in the hands of the very electors seeking the transfer is certainly a "significant" change to the existing statutory school district transfer process, which has been in place to ensure that territorial transfers do not increase racial isolation or negatively impact the district losing students.  *See* DeMaria Dep. 138:7–19, ECF No. 126 (testifying he is unaware of any other instance in which the legislature removed a role historically given to the State Board of Education and put it in the hands of voters); O.R.C. § 3311.24(4); Ohio Admin. Code 3301-89-01(F) ("A request for transfer of territory shall be considered upon its merit with primary consideration given to the present and ultimate good of the pupils in the affected districts."); Ohio Admin. Code § 3301-89-02(D) (requiring the State Board Defendants to consider, *inter alia*, whether a transfer will increase racial isolation or have a negative impact on the affected school districts); Ohio Admin. Code § 3301-89-03(B)(5), (8) ("The transfer shall not cause, preserve, or increase racial isolation[.]"; "The pupil loss of the relinquishing district should not be such that the educational program of that district is severely impaired[.]").

---

[26] This is evident from the Irondale Circle transfer request.  *See* May Decl. ¶ 6, ECF No. 108 at PAGEID # 1493; *id.* Ex. 2, ECF No. 108 at PAGEID # 1518.  This request would transfer just eight houses from Plain Local School District to North Canton City School District.  *Id.*  The transfer petition was signed by four people residing in only two houses.  *Id.* at PAGEID # 1519.  On March 17, 2020, the residents of Irondale Circle voted 13 to 1 to effectuate the transfer.  Jordan Decl. Ex. 14, ECF No. 109 at PAGEID ## 2441–42.

And even though it is not required, the transfer statute is also quantitatively significant. Although no one seems to know exactly how far reaching this statute is, it may apply to more than 400 of the state's 610 school districts. Brinkman Dep. 6, ECF No. 124 (stating his understanding that more than 400 school districts could be affected); Oelslager Dep. 7, ECF No. 117 (testifying there are "many" affected districts); DeMaria Dep. 88:21–89:22, ECF No. 126 (stating he has no idea how many of the state's 610 school districts will be affected).

Yet despite the substantive and significant impact of the statute, it was not separately debated or voted on—indeed was not even discussed—and was instead slipped in as two pages of a bill over 1,000 times that length. This suggests the Fast-Track Transfer Statute is nothing more than a transparent rider, "one of the problems the *Dix* court was concerned about." *Simmons-Harris*, 86 Ohio St. 3d at 16.

### c. Controversial and of Significant Constitutional Importance

The one-subject rule is also meant to limit the presentation to one subject in each bill so that "the issues presented can be better grasped and more intelligently discussed." *Dix*, 11 Ohio St. 3d at 143. This aspect of the one-subject rule "is particularly relevant when the subject matter is inherently controversial and of significant constitutional importance." *Simmons-Harris*, 86 Ohio St. 3d at 16.

The Fast-Track Transfer Statute is inherently controversial. School choice provisions in Ohio have historically been controversial, and this statute is even more so because it upends decades of safeguards protecting both the quality of education for Ohio's schoolchildren and racial integration. Within certain townships, the statute enables the unfettered transfer of communities, or potentially even individual streets or houses, to different school districts with no regard for educational implications or resulting racial isolation. This aspect of the statute renders it controversial.

In fact, both the Ohio School Board Association and the Ohio Education Association have filed an *amicus* brief in support of Plaintiffs' position. ECF No. 60. That this lawsuit has engendered *amicus* filings is, to some extent, itself additional evidence of the controversy surrounding this statute.

Further proof of the controversial nature of this statute is the fact that less than *four months* after the transfer statute became effective, a bill was introduced in the Ohio Senate to repeal it. S.B. 89, 133 Gen. Assemb. (OH 2019) (introduced Feb. 5, 2020). Indeed, Hills and Dales anticipated immediate repeal, which shows it knew how controversial the provision was. Peppard Dep. Ex. 21, ECF No. 123 at PAGEID # 15403 ("Timing is truly very important here. . . . I am highly concerned this will be removed from ORC next year.").

Representatives from both Hills and Dales and the Ohio legislature have even explicitly stated the statute is controversial. *E.g.,* Brinkman Dep., ECF No. 124 at PAGEID # 15505 (email from Representative Bill Seitz calling the transfer

statute "highly controversial"); Peppard Dep. Ex., ECF No. 152-4 at PAGEID # 21104 (email from David Grabowsky calling the revenue implication of the statute "a very incendiary subject").

And, even though the Fast-Track Transfer Statute *is* controversial (as was the school voucher program in *Simmons-Harris*), the Supreme Court of Ohio has "emphatically reject[ed]" the argument that a statute *must* "contain highly charged political issues, involve high profile legislation, or embody . . . provisions that would have a great deal of political opposition" to violate the one-subject rule. *In re Nowak*, 104 Ohio St. 3d at 480 (internal quotation marks omitted).

To be clear, this Court is not second-guessing the wisdom of the Fast-Track Transfer Statute or the policy decisions of the Ohio Legislature. That is not this Court's place. *Groch v. Gen. Motors Corp.*, 117 Ohio St. 3d at 230. It is enough that the Court recognizes the inherently controversial nature of the provision because the one-subject rule is aimed precisely at ensuring that such controversial issues "can be better grasped and more intelligently discussed" when they are included in a bill to which they have a natural tie. *Dix*, 11 Ohio St. 3d at 143. The Fast-Track Transfer Statute is certainly controversial enough to spark vigorous discussion if aired in public debate; unfortunately, because it was slipped into the budget bill, the proponents of the statute were able to ensure

there would be no public debate—not to mention vote—on the standalone merits of the transfer statute.[27]

### d. Disunity of Subject Matter and Lack of Nexus

Third, there is a blatant disunity in subject matter between the Fast-Track Transfer Statute and the state budget. The appropriations bill amends hundreds of sections, enacts hundreds of new statutes, and repeals hundreds of sections of the revised code. *See* Am. Sub. H.B. 166, 133d Gen. Assemb. (Ohio 2019). The stated purpose of the appropriations bill is "[t]o make operating appropriations for the biennium beginning July 1, 2019, and ending June 30, 2021, and to provide authorization and conditions for the operation of state programs." *Id.* at Summary. The Fast-Track Transfer Statute, on the other hand, does not concern either operating appropriations or the operation of any state program, and Defendants' attempt to provide a rational reason for combining the transfer statute in the budget bill is unpersuasive.

Hills and Dales argues[28] that the Fast-Track Transfer Statute is appropriate for inclusion in House Bill 166 because it shares the common thread of

---

[27] The controversial nature of the transfer statute, alone, warrants separate presentation and discussion of the issues contained in the statute such that the Court need not also consider whether the transfer statute is of significant constitutional importance. The Court notes, however, that Plaintiffs have alleged various constitutional challenges to the statute, implicating both the Equal Protection Clause and the Due Process Clause.
[28] The Court agrees with the State Board Defendants and Hills and Dales that Hills and Dales is not a proper Defendant for Plaintiffs' one-subject rule claim and that this claim should be asserted against only the State Board Defendants. Accordingly, the Court **DISMISSES** Plaintiff's claim under Article II, § 15(D) of the Ohio Constitution to the extent it is asserted against Hills and Dales. Nonetheless, the Court considers the

Case No. 2:19-cv-5086                                                    Page 53 of 68

"balancing of state expenditures against state revenues to ensure operation of state programs." Hills and Dales Resp. 34–35, ECF No. 138. In support, Hills and Dales points to the impact the provision may have on school district tax revenue and indebtedness as well as costs to local boards of elections. *Id*. at 35 (citing Legislative Service Commission ("LSC") report). Hills and Dales then summarily concludes that because the Fast-Track Transfer Statute will have some impact on how some tax dollars are spent, it is therefore appropriately included in the state budget bill.

Similarly, the State Board Defendants argue that the LSC report on House Bill 166 shows that the Fast-Track Transfer Statute "affects the allocation of state resources to local governmental entities." Resp. 23 n.17, ECF No. 135. The State Board Defendants then argue that the Supreme Court of Ohio endorsed in *Dix* such a fiscal impact as a sufficient connection to appropriations to satisfy the one-subject rule.[29] *Id*. Hills and Dales' and the State Board Defendants' arguments mischaracterize the evidence and are unpersuasive.

First, the transfer statute is simply not a tax statute. Local property tax implications for the affected school districts are incidental to the transfer process

_____

argument Hills and Dales makes at it relates to Plaintiffs' claim against the State Board Defendants.

[29] *Dix* actually concluded that including appropriations in a bill does not necessarily destroy unity and does not do so where, as there, the appropriations were the means of carrying out the act. *Dix*, 11 Ohio St. 3d at 146. For example, the court agreed, there is no violation where a single bill "establish[es] an agency, set[s] out the regulatory program, and make[s] an appropriation for the agency." *Id*. (internal quotation marks and citation omitted). That is a far cry from the circumstances here.

for it is only upon the successful completion of the process outlined in the Fast-Track Transfer Statute that an affected school district's local tax revenue would change. The statute does not directly concern school district taxes, and it cannot seriously be argued that taxation is one of the purposes or topics of the statute. The purpose of the statute is to create a new mechanism for certain electors to transfer territory from one school district to another without needing to comply with longstanding state-mandated safeguards; changes to a school district's funding from property taxes are an indirect byproduct.

Second, it is patently untrue that the transfer statute directly affects the allocation of state resources to local governments. The transfer statute does not directly impact the allocation of *state* resources in any way. Even the indirect tax implications discussed above apply only to *local* school districts. The LSC's 951-page report on the state budget includes four sentences about the Fast-Track Transfer Statute, LSC Report at 287, *available at* http://www.lsc.ohio.gov/documents/budget/133/MainOperating/CC/CompareDoc/ comparedoc-hb166-ccr.pdf, and none of them mention *state* revenues or liabilities. Instead, the LSC report confirms what is obvious from the statutory text—any impact on taxes is local:

> Fiscal effect: Some districts may gain territory and some may lose territory. May shift *local* tax revenues and indebtedness depending on whether a formal agreement is entered into and the terms of the agreement. May increase the costs incurred by some *county boards of elections*, particularly if a special election is needed. May increase the administrative costs of the *affected district boards of education*.

*Id.* (emphasis added). Thus, as stated by the Legislative Service Commission itself, the entire fiscal impact of the Fast-Track Transfer Statute concerns the implications to local school boards and local boards of elections. *See id.*

Even state officers concede the Fast-Track Transfer Statute does not impact state education appropriations, which are fixed over the life of House Bill 166.[30] Superintendent DeMaria testified that the change in local tax revenue could hypothetically have an indirect impact on the state budget. DeMaria Dep. 67:17–68:14, ECF No. 126 (testifying that changes to the tax base and pupil count of affected school districts could factor into computations regarding the payment of state funds to those districts). But Aaron Rausch, Director of the Ohio Department of Education, Office of Budget and School Financing, contradicted that, testifying that transfers processed under the Fast-Track Transfer Statute would *not* affect state funding to school districts for the current biennium.

> State funding for fiscal year '20 and fiscal year '21 is equal to state funding in fiscal year '19 regardless of any sort of changes in student enrollment counts or property valuation.

---

[30] While the Fast-Track Transfer Statute could potentially have indirect implications on the state budget and revenue, any connection would likely only manifest itself in future local school board requests from the state coffers to make up for lost property tax revenue. Such an indirect and distant connection cannot be called a nexus that justifies the inclusion of the Fast-Track Transfer Statute in this biennial budget bill if the one-subject rule is to have any meaning. *State ex rel. Ohio Civ. Serv. Emps. Ass'n*, 104 Ohio St. 3d at 131 (rejecting idea that "a provision that impacts the state budget, even if only slightly, may be lawfully included in an appropriations bill merely because other provisions in the bill also impact the budget" because "such a notion . . . renders the one-subject rule meaningless in the context of appropriations bills because virtually any statute arguably impacts the state budget, even if only tenuously.").

Rausch Dep. 34:20–23, 78:11–15, ECF No. 118. The current state funding formula for the period covered by the appropriations bill at issue is "FY '20 state funding equals FY '19." *Id.* at 80:25–81:1. It is *not* the case that the formula for calculating state funding has stayed the same but that the variables—and thus the resulting state funding—could change due to the impact of transfers under the Fast-Track Transfer Statute. *See id.* at 81:2–15. Rather, "a school district transfer would not be taken into account for purposes of calculating the state funding formula right now[.]" *Id.* at 81:16–20. This is further evidence that the Fast-Track Transfer Statute will not affect the state budget or the allocation of state educational funds during this biennium and is therefore unrelated to the biennial budget.

In sum, the plain language of the statute, the LSC report, and the testimony show that the Fast-Track Transfer Statute has no direct impact on state finances and no connection to any legitimate biennial state budgetary concerns. Moreover, the *local* fiscal impact alone, absent a direct state connection, demonstrates that there is no nexus between the Fast-Track Transfer Statute and the larger appropriations bill. *See City of Dublin*, 769 N.E.2d at 450–51 (2002) (holding that a provision preventing some municipalities from collecting certain revenue was not related to an appropriations bill even though the appropriations bill contained other appropriations to municipalities); *Cleveland*, 989 N.E.2d at 1087 (finding that to adopt such logic would mean that "every subject matter statewide that conceivably can be connected to a dollar of

not merely state funding but also municipal spending could be substantively regulated in a single appropriations bill."). Indeed, if the school choice program in *Simmons-Harris*—for which state funds were directly appropriated from the budget bill in which it was contained—was deemed insufficiently related to the state budget to be included in the bill, 86 Ohio St. 3d at 16, the Fast-Track Transfer Statute here likewise must lack a sufficient nexus for it cannot seriously be argued that this transfer statute more directly affects the 2020–2021 biennial state budget than did the challenged school choice program in *Simmons-Harris*.

Finally, Defendants have not offered any other rational reason for including the Fast-Track Transfer Statute in the budget bill. As such, there is no nexus between the Fast-Track Transfer Statute and House Bill 166.

### d. Conclusion regarding *Simmons-Harris* factors

For the above reasons, the three factors considered in *Simmons-Harris* yield the same results here as they did in that case. The Fast-Track Transfer Statute is a significant and substantive provision that is controversial, and there is no common purpose or relationship between the transfer statute and the state budget. In other words, there is "no discernible practical, rational or legitimate reason[]" to combine the transfer statute with that budget bill. *See Simmons-Harris*, 86 Ohio St. 3d at 14. Moreover, the controversial nature of the statute supports requiring intelligent public discussion of the merits of the transfer statute prior to passing the same. But no such discussion or debate took place. The considerable reasons for holding separate discussion coupled with the lack of a

nexus create "a strong suggestion that the provisions were combined for tactical reasons[.]" *Simmons-Harris*, 86 Ohio St. 3d at 14. An amendment that is "not germane to the subject under consideration," i.e., the budget, it is exactly the sort of "extraneous" amendment that the one-subject rule was designed to prevent. *Dix*, 11 Ohio St. 3d at 143.

### e. Additional Evidence the Statute is a Mere Rider

The Supreme Court of Ohio rejected the argument that disunity of subject matter can be excused "so long as there is no other evidence of logrolling." *In re Nowak*, 104 Ohio St. 3d at 480. Disunity of subject matter is the only requirement—no extrinsic evidence of logrolling is required to find a statute violates the one-subject rule. *Id.* at 481 ("[T]he one-subject provision does not require evidence of fraud or logrolling beyond the unnatural combinations themselves.").

However, although it is not necessary, the Court finds that the evidence of logrolling here goes beyond the inferences that can be gleaned from application of the *Simmons-Harris* considerations. The very manner in which the Fast-Track Transfer Statute was passed (not to mention the manner in which it may be repealed) suggests that it was nothing more than a rider.

As the Court explained above, Plaintiffs and Hills and Dales dispute whether Hills and Dales drafted the language that eventually became the Fast-Track Transfer Statute. While Hills and Dales had an obvious interest in the legislation and was instrumental in securing its passage, State Representative

Thomas Brinkman testified that he "spearheaded" the legislation.  Brinkman Dep. 2, ECF No. 124.  The exact author of the statute is largely irrelevant to assessing violations of the one-subject rule, however.  What is significant is that the legislation was drafted for the specific purpose of permitting a special interest group to evade existing legislation, and the process behind the statute's passage shows it was tucked into an appropriations bill as a tactical maneuver to achieve that goal.[31]  *See Cleveland*, 989 N.E.2d at 1085.

The Fast-Track Transfer Statute was not a part of House Bill 166 when the bill was first introduced on March 25, 2019.  *See* Martinsek Decl. Ex. 7, ECF No. 110.  Rather, it was tucked into the May 2, 2019 House Finance Committee amendments, which added almost 1,000 pages to the original appropriations bill. *See* Martinsek Decl. Ex. 11, ECF No. 110 at PAGEID # 4330.  The House Finance Committee reported the substitute bill (with the Fast-Track Transfer Statute included) back to the House for consideration on May 9, 2019, the same day the House passed the substitute bill.  Martinsek Decl. Ex. 13 (House Journal 5/9/2019), ECF No. 110 at PAGEID ## 7062–71.  Despite days of prior public debate on various provisions in the appropriations bill, there was no discussion or

---

[31] It thus does not matter whether the statute was drafted by Hills and Dales to permit its transfer or by Representative Brinkman to permit Columbia Township to transfer to Mariemont City School District.  Either way, it is undisputed that the impetus of the statute was to permit one territory to bypass existing laws and effectuate a transfer between school districts.

debate about the Fast-Track Transfer Statute—not even in the House Finance Subcommittee. *See, e.g.*, Cera Aff. Ex. 1, ECF No. 111-8 at PAGEID # 13212.

Thereafter, the provision was deleted by the Ohio Senate Finance Committee, and the Senate passed Amended Substitute House Bill 166 without the provision. *See* Martinsek Decl. Ex. 16 (Senate Journal 6/20/19), ECF No. 110 at PAGEID ## 4647–68; *id.* at Ex. 17, ECF No. 110 at PAGEID ## 7113–10329.

When Hills and Dales Councilman Peppard learned that the Fast-Track Transfer Statute had been removed from the Senate version of the appropriations bill, he called Senator Schuring and asked him to get the statute reinserted into the bill. Schuring Dep. 5, ECF No. 119. Senator Schuring advised Councilman Peppard to write a letter to the Conference Committee. Peppard Dep. 119:1–18, ECF No. 123. Peppard also called Representative Oelslager, Mayor Samolczyk, and Roger Deville to lobby for the language's reinsertion. *E.g.*, Peppard Dep. 212:5–213:22; 222:1–224:23; 228:2–229:1, ECF No. 123; Oelslager Dep. 6, ECF No. 117. Councilman Peppard "worked pretty tirelessly" to ensure the legislation was passed. Peppard Dep. Ex. 23, ECF No. 123 at PAGEID # 15411.

House Bill 166 went to Conference Committee, which held a single hearing on June 25, 2019, without the provision included.

On July 6, 2019, Councilman Peppard and other Hills and Dales residents sent a letter to the Conference Committee regarding the importance of the Fast-

Track Transfer Statute to Hills and Dales and urging the committee to reinsert the statute into the appropriations bill.  Peppard Dep. Ex. 15, ECF No. 123 at PAGEID ## 15391–92.

Then, on July 16, 2019, Representative Oelslager moved to reinsert the Fast-Track Transfer Statute into the appropriations bill, over Representative Cera's objection.  Conference Committee hearing 7/16/2019 at 36:09–36:26, available at http://www.ohiochannel.org/video/conference-committee-7-16-2019-am-sub-h-b-no-166?start=2166.  The motion was approved without further discussion by a vote of 4-2, *id.*, and the provision was then re-inserted in the Conference Committee report.  *See* LSC Report 286, *available at* https://www.lsc.ohio.gov/documents/budget/133/MainOperating/CC/CompareDoc/comparedoc-hb`66-ccr.pdf.  The House and Senate agreed to the Conference Committee report the next day.  The transfer statute comprises about two pages of the enacted 2,600+ page bill.  *See* Am. Sub. H.B. 166, 133d Gen. Assemb. (Ohio 2019).

This history shows that, despite being a significant and controversial provision, the Fast-Track Transfer Statute managed to slip in and out of House Bill 166 at times that kept it out of public debate.  Similar to the provision that was struck in *Cleveland*, *see* 989 N.E.2d at 1085, the Fast-Track Transfer Statute was not "discussed in subcommittee at all," there was no testimony to any legislative committee regarding the transfer statute, and the General Assembly "didn't know which districts [it] would apply to or who was seeking it" at the time

of the vote.  Resp. Ex. 11, ECF No. 88-5 at PAGEID # 1242; Schuring Dep. 6–7,

ECF No. 119 at PAGEID ## 14571–72, *id.* at PAGEID # 14648 (telling the

Canton Repository that "there is a lot of uncertainty in how the law would be

implemented" and expressing his concern that the statute does not consider the

impact on affected students).  Importantly, not even the legislators pushing for

the bill, Representative Oelsalger and Representative Brinkman, were aware of

the impact the statute would have before it was voted on.  Oelsalger Resp. 7,

ECF No. 117; Brinkman Resp. 6, ECF No. 124 (stating he does not know how

many school districts are impacted by the transfer statute but believes it could be

over 400).  It is the lack of such discussion, debate, and information that caused

Representative Cera to vote against including the amendment.  Resp. Ex. 11,

ECF No. 88-5 at PAGEID # 1242.

By lawmakers' own admissions, then, the statute was not discussed,

debated, or fully understood prior to its enactment.[32]  The Court finds it was no

coincidence that the controversial Fast-Track Transfer Statute escaped analysis

and debate.  Rather, the procedural history of the statute shows that it was

tactically crammed into the budget bill to secure its passage for fear it might not

garner enough votes if it was considered on its own merits.[33]  Indeed,

---

[32] Of course, there is no general requirement legislators understand their own bills.
However, the lack of debate or understanding of a controversial provision, particularly
one passed at the urging of interest groups, has been held to be evidence of logrolling.
*See Cleveland*, 989 N.E.2d at 1085–86.

[33] The State Board Defendants argue that there were no procedural anomalies and that
the transfer statute followed the typical process for adding amendments to an

Councilman Peppard believed as a tactical matter that the best time to include the transfer statute was in the must-pass budget bill.  *See* Peppard Dep. 224:11–23, ECF No. 123 (stating he tried to "create a level of importance" given that the appropriations bill "had to get passed or Ohio would not have an operating budget" and "there was a deadline looming").

This case is thus similar to *Cleveland v. State*, where the addition of a controversial provision to an appropriations bill without debate and absent any meaningful analysis was found to be an impermissible tactical rider.  989 N.E.2d 1072, 1085–87 (8th Dist. 2013).  In *Cleveland*, the plaintiff city passed an ordinance banning the sale of foods containing trans-fats, and an interest group representing restaurants urged the legislature to add a provision to an appropriations bill pre-empting and, in effect, invalidating the local ordinance.  *Id.* at 1075–76, 1085.  After receiving draft language from the interest group, the legislature "tucked" the provision into the 3,000+ page budget bill after the House had already voted on the bill without any hearing or vote on the specific amendment, testimony for or against the amendment, or analysis of the amendment's impact.  *Id.* at 1085.

---

appropriations bill.  Resp. 13–14, ECF No. 135.  Even so, that does not change the fact that the transfer statute is a significant, substantive, controversial provision that was tactically added as a rider to the unrelated, must-pass appropriations bill.  The one-subject rule is not meant to prohibit only those riders that failed to follow the correct legislative process; it is meant to protect against provisions that were procedurally logrolled into an unrelated bill or tactically added to an unrelated bill as a rider.

The court found "the facts giving rise to the birth of the amendments, coupled with the lack of a nexus between the amendments and the appropriations bill, create[d] a strong suggestion that the provisions were combined for tactical reasons" and were a "classic instance of impermissible logrolling." *Id*. at 1085–86.  Further, it was undisputed in *Cleveland* that the challenged provision would have no direct impact on the state budget.  *Id*. at 1086.  While the court acknowledged the provision could in theory have some tangential and indirect impact on state revenues, the court found an insufficient nexus between the provision and state revenues to satisfy the one-subject rule. *Id*. at 1087.  The court therefore struck the provision as violating the one-subject rule.  *Id*.

As shown above, the Ohio Legislature's actions in passing the Fast-Track Transfer Statute are similar to those in *Cleveland*.  And just as that court and the *Simmons-Harris* court did, this Court finds that the Fast-Track Transfer Statute's inclusion in the budget bill was nothing other than a tactical rider or logrolling.

For these reasons, the Court holds that the inclusion of the Fast-Track Transfer Statute in the budget bill is a manifest and fraudulent—which in this context merely means "blatant"—violation of the Ohio Constitution's one-subject rule.  *See In re Nowak*, 104 Ohio St. 3d 466, 475, 477 (2004) (stating, "a manifestly gross and fraudulent violation of the one-subject provision . . . will cause an enactment to be invalidated" and equating manifestly gross and fraudulent violation with a "blatant" violation).

Nonetheless, if a bill violating the one-subject rule has a discernable primary subject, "the appropriate remedy . . . is generally to sever the offending portions of the act to cure the defect and save the portions of the act that do relate to a single subject." *Ohio Civ Serv. Emps. Ass'n*, 146 Ohio St. 3d at 320 (internal quotation marks and citation omitted); *see also Simmons-Harris*, 86 Ohio St. 3d at 16. Finding that House Bill 166 has a primary purpose as an appropriations bill, the Court holds that the Fast-Track Transfer Statute must be severed to retain the rest of the bill. Accordingly, the Fast-Track Transfer Statute, Ohio Revised Code § 3311.242, is severed from the remainder of the budget bill and it, only, is **STRICKEN** as unconstitutional.

The Court recognizes the extraordinary step it takes today by striking an Ohio statute as unconstitutional under the Ohio Constitution. However, where, as here, the State has waived its sovereign immunity, and the Court deems it necessary and proper to exercise supplemental jurisdiction, the Court cannot shirk or avoid its duty to follow the law as it is written in the Ohio Constitution and interpreted by the highest court in the state. "The one-subject rule is part of [the Ohio] Constitution and therefore must be enforced." *Simmons-Harris*, 86 Ohio St. 3d at 37. The Court's order today does just that.

## IV. CONCLUSION

It is not unconstitutional to lobby one's representatives for favorable legislation or for an appropriations bill to contain statutes touching upon many different topics (indeed that is common). However, when a significant and

controversial statute that has only a hypothetical and tangential bearing on the state's biennial operating budget is tactically attached, without discussion, testimony, or debate, as a rider to that operating budget bill in order to secure its passage, its inclusion violates the one-subject rule contained in Ohio's constitution.

This Opinion and Order leaves open the possibility that, after proper consideration and debate over the merits of the statute, the Ohio legislature will make a reasoned decision to adopt the legislation. This Opinion and Order holds only that the Fast-Track Transfer Statute was not properly contained within the budget bill, and any future consideration of the statute must be as part of a bill with which the provision has a discernible practical, rational, or legitimate connection.

For the above reasons, the Court **GRANTS** Ohio School Boards Association's and Ohio Education Association's motion for leave to file an *amicus curiae* brief, ECF No. 60. The Court **GRANTS** Hills and Dales summary judgment on Plaintiff's one-subject rule claim as it is not a proper defendant for purposes of that claim. The Court **GRANTS** summary judgment to Plaintiffs on Plaintiffs' one-subject rule claim against the State Board Defendants and, because the relief granted on that claim accords Plaintiffs all the relief they seek, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' remaining claims. Accordingly, the Court **DENIES AS MOOT** the remainder of Plaintiffs' summary judgment motion, ECF No. 129. The Court **DENIES** the State Board Defendants

summary judgment on Plaintiffs' one-subject rule claim and **DENIES AS MOOT** the remainder of Defendants' summary judgment motions, ECF Nos. 137, 138. The Court **DENIES AS MOOT** Hills and Dales' motion to amend or correct the TRO Order, ECF No. 104.

Ohio Revised Code § 3311.242 is **SEVERED** from House Bill 166 and **STRICKEN AS UNCONSTITUTIONAL**. The State Board Defendants, their officers, agents, servants, employees, attorneys, and any persons in active concert or participation with them are **PERMANENTLY ENJOINED** from taking any further action under the stricken statute, including from approving any transfer proposals submitted pursuant to subdivision (F) of the stricken statute. Hills and Dales is **PERMANENTLY ENJOINED** from taking or facilitating the taking of any action under § 3311.242.

Defendants' motions for attorneys' fees are **DENIED**. The Court will rule on Plaintiffs' motion for attorneys' fees in a separate Opinion and Order.

The Clerk is directed to enter final judgment in favor of Plaintiffs and against the State Board Defendants on the one-subject rule claim, dismiss the one-subject rule claim against Hills and Dales with prejudice, dismiss the remaining claims without prejudice, and terminate this case.

**IT IS SO ORDERED.**

_/s/ Michael H. Watson_
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**